No. 92,087

STATE OF KANSAS, *Appellee,* v. JOHN F. FRANCIS, *Appellant.*
145 P.3d 48

Opinion filed October 27, 2006.

*Bob L. Thomas,* Thomas & Associates, LLC, Olathe, argued the cause, and *Megan L. Harrington,* of the same firm, was with him on the brief for appellant.

*Steven J. Obermeier,* assistant district attorney, argued the cause, and *Paul J. Morrison,* district attorney, and *Phill Kline,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: John F. Francis appeals his conviction by a jury of first-degree murder. He claims numerous errors occurred at trial. Several of the errors relate to the admission of evidence. He also raises questions as to jury instructions, closing argument, jury questions, and posttrial motions.

## FACTS

On February 18, 1998, Clem Hollingsworth IV died as the result of a gunshot wound which he sustained while a passenger in the back seat of a car driven by his mother. The shot was fired from another vehicle. The State's theory was that Hollingsworth was killed in revenge for the murder of Frederick Johnson.

About 8 months earlier, in June 1997, Clem Hollingsworth shot and killed Frederick Johnson and shot and wounded Jason Smith. Hollingsworth was arrested on June 20, 1997, and charged with Johnson's murder. On February 17, 1998, Hollingsworth's mother, Sharon Hollingsworth, paid the bond to secure her son's release

from jail. Among the people who were notified pursuant to the Missouri victims' rights statute of Hollingsworth's release was Frederick Johnson's mother. Hollingsworth was shot and killed in the early morning hours of February 18.

Frederick Johnson was the brother of Richard Johnson and the cousin of the defendant, John Francis. Hollingsworth and Francis were friends. At the time of Frederick Johnson's death, Corey Shannon, another friend of Hollingsworth and Francis, was incarcerated in Missouri. A few weeks after Johnson's murder, Sharon Hollingsworth telephoned Shannon, then telephoned Francis as if the call were coming directly from Shannon, and listened to Shannon and Francis talk about the murder. Francis told Shannon that if he did not get Clem Hollingsworth, "he would get the next thing closest to him."

In early February 1998, before Hollingsworth's mother paid his bond, the defendant along with several other people had visited James "Tony" Gillihan at the KC Bail Bonding Company. They wanted to pay Hollingsworth's bond and get him released. They did not have enough money to pay the bond but urged Gillihan to let them pay less, saying, "You're not going to be on the bond very long." When Gillihan said he would not make the bond for the $5,000 they were offering, Francis said, "That's the motherfucker who killed my cousin a couple weeks ago," and reiterated that Gillihan would only be on the bond a couple of days. Gillihan refused to be involved. Then someone with Francis offered another $2,500 and said, "Don't worry about [it]; you're not going to lose anything. As soon as they find his body, you're off the bond." Later, after hearing that Hollingsworth had been killed, Gillihan called the TIPS Hotline.

Hollingsworth was released from jail at approximately 7:30 the evening of February 17. His mother picked him up, and they went to her house. After he showered, they went to visit relatives. At approximately midnight they picked up her friend Karen McCoy when she got off work. The three went to Harrah's in North Kansas City. As they were going into Harrah's, a young man recognized Clem Hollingsworth and greeted him.

At approximately 3 a.m., they left Harrah's with Sharon Hollingsworth driving, McCoy in the front passenger seat, and Clem Hollingsworth in the back seat. They drove south on I-35 and exited at the Shawnee Mission Parkway ramp. At the yield sign to get on Shawnee Mission Parkway westbound, a car with bright headlights came up behind them. As Sharon drove onto the parkway, the car with the bright lights drove quite close beside her—over the line into her lane. Sharon recognized the defendant in the front passenger seat of the other car.

Clem told Sharon to duck, and gunfire began. When the shooting died down, Sharon put the car in reverse and backed up. She sat up and made a U-turn, almost hitting a truck. Sharon saw two cars turn around to follow her as she drove eastbound. She could see arms outside the car that had been close on her driver's side, and more shots were fired from that car. Sharon pulled into a gas station, and McCoy ran inside to get help. Clem was lying on the back seat bleeding. He was taken by ambulance to the hospital, where he was pronounced dead.

Police recovered shell casings from the westbound lanes of Shawnee Mission Parkway near the ramp from I-35 and near the gas station Sharon had pulled into. A firearms examiner determined that they had been fired from at least five different firearms—three 9 mms, one .38 or .357 caliber, and one .40 caliber Smith & Wesson or 10 mm. A metal bullet jacket was retrieved from Hollingsworth's body during the autopsy and given to police.

A shoebox of ammunition was seized during the search of defendant's residence. Defendant's fingerprint was found on one of the boxes of ammunition in the shoebox. Four guns and a speed loader for a revolver also were seized from his residence. One of the guns, a .38 Special Taurus handgun, could have fired the bullet with the jacket retrieved from Hollingsworth's body during the autopsy.

## DISCUSSION

### MOTION TO SUPPRESS

On February 23, 1998, defendant's residence at 429 Topping, Kansas City, Missouri, was searched pursuant to a warrant. In a

motion to suppress, defendant challenged the validity of the warrant and the underlying affidavit. The trial court denied Francis' motion. The trial court made the following findings of fact:

"On February 18, 1998, a homicide occurred along Shawnee Mission Parkway in Johnson County, Kansas. The victim, Clem Hollingsworth, was riding in the back seat of a moving vehicle when two other vehicles pulled along side him and began shooting into the car. The driver, Sharon Hollingsworth, and front seat passenger were uninjured. Clem was killed. This was done, apparently, in retaliation for Clem allegedly killing the defendant's cousin. Multiple types of firearms were used in the shooting. Over 40 bullet holes were found in the car. Sharon Hollingsworth identified the defendant as possibly being one of the perpetrators of the crime.

"On February 23, 1998, at approximately 8:00 p.m., the Kansas City, Missouri Police Department and members of the Metro Squad executed a search warrant on defendant's home at 429 Topping, Kansas City, Jackson County, Missouri. Police officers announced their presence by yelling 'police, search warrant' several times while the officers entered the dwelling by forced entry through the front door. The officers did not knock on the door prior to entry.

"The subsequent search of defendant's residence revealed the presence of four firearms, assorted ammunition, a shell casing, a plastic bag with white substance, and various documents."

On appeal, defendant does not dispute the facts found material by the trial court to its decision. When the facts material to a trial court's decision on a motion to suppress evidence are not in dispute, the question of whether to suppress is a question of law over which an appellate court has unlimited review. *State v. Ramirez*, 278 Kan. 402, 404, 100 P.3d 94 (2004).

Particularity of the warrant. The Fourth Amendment to the federal Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The search warrant at issue stated that there is probable cause to believe that "[b]ullets, bullet fragments, weapons, shell casings, blood, bodily fluids, and other related trace and physical evidence related to a fatality shooting to victim, Clem Hollingsworth IV." Defendant contends that the term "weapons" lacks the necessary particularity. He suggests that the term "firearms" should have been used instead of weapons.

The requirement that warrants shall particularly describe the things to be seized prevents the seizure of one thing under a warrant describing another. *Stanford v. Texas*, 379 U.S. 476, 485, 13 L. Ed. 2d 431, 85 S. Ct. 506, *reh. denied* 380 U.S. 926 (1965) (citing *Marron v. United States*, 275 U.S. 192, 196, 72 L. Ed. 231, 48 S. Ct. 74 [1927]). The constitutional standard for particularity of description in a search warrant is that the language be sufficiently definite to enable the searcher reasonably to ascertain and identify the things authorized to be seized. *Steele v. United States No. 1*, 267 U.S. 498, 503-04, 69 L. Ed. 757, 45 S. Ct. 414 (1925). Hence, the specificity required hinges on the circumstances of each case. See *United States v. Lowe*, 50 F.3d 604, 607 (8th Cir. 1995).

In this case, the context in which the term "weapons" appears—bullets, bullet fragments, weapons, and shell casings—effectively defines the weapons to be seized as firearms. The term "weapons" in its context was sufficiently definite to enable the officers who executed the warrant reasonably to ascertain and identify that the things authorized to be seized were firearms. The warrant did not fail to describe particularly the things to be seized because it did not create a danger of mistake or of unlimited discretion in the executing officers' determination of what was subject to seizure. See *United States v. Savoca*, 761 F.2d 292, 298-99 (6th Cir. 1985) ("weapons" included in warrant's description of things to be seized, citing *Andresen v. Maryland*, 427 U.S. 463, 480, 49 L. Ed. 2d 627, 96 S. Ct. 2737 [1976]).

Knock and announce. Francis contends that the district court erred in denying his motion to suppress because the warrant was illegally executed by officers who failed to knock before entering his residence. Since Francis filed his brief, the United States Supreme Court has issued its opinion in *Hudson v. Michigan*, 547 U.S. 586, 165 L. Ed. 2d 56, 126 S. Ct. 2159 (2006), deciding that evidence seized when officers with a search warrant did not knock before entering a residence need not be excluded. A new rule for the conduct of criminal prosecutions is to be applied to cases pending on direct review, with no exception for cases in which the new rule constitutes a "clear break" with the past. *United States v. Booker*, 543 U.S. 220, 268, 160 L. Ed. 2d 621, 125 S. Ct. 738 (2005)

(citing *Griffith v. Kentucky*, 479 U.S. 314, 328, 93 L. Ed. 2d 649, 107 S. Ct. 708 [1987]); see *State v. Barnes*, 278 Kan. 121, 124-27, 92 P.3d 578 (2004). The *Hudson* rule, in the circumstances of the present case, is controlling, and the district court did not err in denying the motion to suppress on the ground that the officers failed to knock before entering defendant's residence.

Oath or affirmation. The Fourth Amendment requires warrants to be "supported by Oath or affirmation." The affidavit/application for the search warrant at issue identifies Laurie Borkowski as the affiant and applicant. But the person who signed the affidavit/application as the affiant and applicant was Detective Bennie White. Francis contends that the warrant was invalid on account of the discrepancy. He cites no authority for his position.

The State cites *State v. Smith*, 867 S.W.2d 343 (Tenn. Crim. App. 1993), in which, as in the present case, the signature of the affiant to a search warrant was that of a different person from the one named in the typed portion of the affidavit. The Tennessee court concluded that the discrepancy did not invalidate the warrant. Here is its full discussion of the issue:

"The search warrant contained an error of reference. 'Mike Phillips' was initially identified as the affiant. At the conclusion of the affidavit, however, the signature of Dorris Weakley, Sheriff of Cheatham County, appears on the affidavit. It is attested to by the issuing magistrate. The error is as obvious as it appears inadvertent. It does not qualify, as the defendant suggests, as a false allegation, recklessly made, so as to render the affidavit ineffective. In *State v. Little*, 560 S.W.2d 403, 407 (Tenn. 1978), our Supreme Court established two circumstances authorizing the impeachment of a search warrant affidavit otherwise sufficient on its face:

(1) a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause, and

(2) a false statement, essential to the establishment of probable cause, recklessly made.

"This mistake appears to have been unintentional. It does not relate to the establishment of probable cause. The testimony established that Mike Phillips had nothing to do with the case." 867 S.W.2d at 350.

In *Smith*, following the defendant's argument, the Tennessee court applied the test for attacking the accuracy of an affidavit's content to the quite different question of the mismatch of typed

128

name and signature. In *Franks v. Delaware*, 438 U.S. 154, 57 L.
Ed. 2d 667, 98 S. Ct. 2674 (1978), the Supreme Court held that a
defendant will be given an evidentiary hearing on the veracity of a
warrant affidavit after the warrant has been executed only where
defendant makes specific allegations of deliberate falsehood or of
reckless disregard for the truth and accompanies the allegations by
an offer of proof. Allegations of negligence or innocent mistake are
insufficient. It was on this basis that the Tennessee court dismissed
Smith's concerns.

But the *Franks* analysis is misapplied to this issue where Francis'
complaint is that the typed name and the signature do not match.
He asserts, with no substantiation or reference to the record, the
following: "Clearly, the affidavit was not sworn to by the affiant
and the information contained in it would have been more accurate
and more reliable had the affiant who applied for the search war-
rant signed it." But, not only is the assertion unsupported, it does
not amount to an attack on the veracity of the affidavit. Francis
contends that the information would have been more accurate and
more reliable, but he does not contend that the information was
not accurate or reliable.

K.S.A. 22-2511 provides: "No search warrant shall be quashed
or evidence suppressed because of technical irregularities not af-
fecting the substantial rights of the accused." Francis correctly
maintains that the requirement of oath or affirmation supporting
the warrant, which is expressed in the Fourth Amendment, is not
a technical irregularity. But the actual contention here is not that
the warrant lacked the support of an oath or affirmation. Rather,
it is that the affidavit supporting the warrant bears the typed name
of one person and the signature of another, which would not merit
the constitutional inquiry advocated by Francis unless because of
the discrepancy the person making the statement supporting the
warrant had not done so under oath or affirmation. Here, that did
not happen.

The evidence that an oath was duly administered to the person
making the statement is the jurat, which follows the statement and
is signed by the judge who issues the warrant. *State v. Journey*, 1
Kan. App. 2d 150, 151-52, 562 P.2d 138 (1977). In this case, the

jurat form appears immediately beneath the signature lines of the assistant prosecutor and the affiant/applicant. The jurat states: "Subscribed and Sworn to me this 23rd day of Feb., 1998, at the hour of 5:16 PM," and it is signed on the signature line for the judge. The judge's completion and signing of the jurat signifies that an oath was duly administered to Detective Bennie White, the person who made the statement and signed as affiant and applicant.

<u>False statements and reckless disregard for the truth.</u> Francis contends that the affidavit contains false statements about Sharon Hollingsworth's identification of him, her description of a car, and the search of the vehicle parked behind defendant's residence. There is a presumption of validity with respect to an affidavit supporting a search warrant. If defendant alleges and supports his allegations with an offer of proof under oath that the affidavit or application for search warrant contains material statements of deliberate falsehood or of reckless disregard for the truth, a challenge to the validity of an affidavit is permitted. *Franks*, 438 U.S. at 171. In this case, the trial judge permitted defendant to present evidence and argument on his motion to suppress, a portion of which pertained to his challenge to the veracity of the affidavit. "If a trial court's findings from a *Franks v. Delaware*, 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978), evidentiary hearing are based on substantial evidence, this court on review will not substitute its view of the evidence for that of the trial court." *State v. Henry*, 263 Kan. 118, Syl. ¶ 3, 947 P.2d 1020 (1997).

With regard to Francis' challenge to the veracity of the affidavit, the trial court stated:

" 'There is a presumption of validity with respect to an affidavit supporting a search warrant and generally a party against whom a search warrant is directed may not dispute the matters alleged in the supporting affidavit or application.' *State v. Jacques*, 225 Kan. 38, 43, 587 P.2d 861 (1978). An exception to this rule is if the challenge is supported by allegations and proof under oath that 'the affidavit or application for search warrant contains material statements of deliberate falsehood or of reckless disregard for the truth.' *Id.* at 44. Although the State generally bears the burden of proof on a motion to suppress, the defendant bears the burden of showing that any alleged falsehoods contained in an affidavit were deliberate or that there was a reckless disregard for the truth or that material information was omitted. *Id.*; *State v. Lockett*, 232 Kan. 317, 319, 654 P.2d 433

(1982). The defendant has not met this burden. Moreover, the statements in the affidavit appear to the Court to be fair and accurate descriptions of the events that transpired. The warrant accurately describes Sharon Hollingsworth's identification of the defendant as varying in degrees of certainty. Affidavit, ¶ 6. The warrant indicates that Hollingsworth was unclear as to the exact make and model of the suspect vehicles. Affidavit ¶ 8. The affidavit points out the pros and cons of the case as it existed at the time the warrant was sought. The references to a January 21, 1998 search of defendant's car in ¶ 11 are mere typographical errors. The date should have been February 21, 1998. When taken as a whole, the Court finds that the affidavit does not contain deliberate falsehoods or a reckless disregard for the truth."

Defendant contends that the first sentence of Paragraph 5 of the affidavit is false. That sentence states: "Sharon Hollingsworth was able to identify an occupant of one of the suspect vehicles as being John F. Francis, BM, 061074." The defendant's position, as stated in his brief, is that "[i]f Sharon Hollingsworth was not 100% certain, and she was the only witness that places him at the scene of the crime, . . . it can not be considered a positive identification and is a false statement." Defendant is unable to cite any authority for his position. There is nothing false about the statement that Sharon Hollingsworth identified one of the people in the car as John Francis. Hollingsworth did identify Francis as one of the car's occupants. As the trial judge observed, there is a question about the certainty of her identification, but the level of certainty demonstrated by Hollingsworth is a separate subject and is forthrightly discussed in Paragraph 6 of the affidavit. It states: "Sharon Hollingsworth has been questioned on at least three separate occasions. Sharon Hollingsworth has wavered from being certain about having seen Francis in one of the suspect vehicles. As of the most recent interview which occurred on today's date Sharon Hollingsworth indicates that although not 100% certain she believes that the occupant is in fact John F. Francis."

Francis next complains of various problems with the information in Paragraphs 8, 9, 11, and 12 of the affidavit. Those paragraphs state:

"8. Sharon Hollingsworth described one of the vehicles from which shots were being fired as a larger gray four door possibly an Oldsmobile or Chevrolet.

"9. On 02/20/98 John Francis was contacted by members of the Metro Squad for an interview. Francis refused to provide a statement. Located in the back of the Francis residence at 429 Topping in Kansas City Jackson County, Missouri was a Gray 1984 Chevrolet Caprice four door with Missouri license plate 915-BWS.

. . . .

"11. A search warrant for the vehicle parked behind the Francis residence was obtained on January 21, 1998 in order to recover evidence of bullets, bullet fragments, weapons, shell casings, and any other trace and or physical evidence including but not limited to latent prints, for comparison purposes to evidence being developed by the Metro Squad concerning the Hollingsworth homicide.

"12. The 1984 Chevrolet Caprice was searched pursuant to the warrant which was executed on January 23, 1998 by the Kansas City Missouri Police Crime Lab. The affiant believes that John Francis, BM, 06-10-74, who lives at 429 Topping, Kansas City, Jackson County Missouri has in his possession weapons used in the shooting death of Clem Hollingsworth IV. Although the vehicle is still being processed for the purposes of gunshot residue, no bullets, bullet fragments, weapons, or shell casings were recovered. Based upon the fact that John Francis was positively identified as a suspect and since weapons were not located in the car we now believe the items being sought are in the house."

Defendant's argument with regard to Paragraph 8 is a bit confusing—he states that the contents of the paragraph are true but are compromised by omissions of Hollingsworth's mistaken belief about ownership of the Chevrolet Caprice and of her not stating that guns were fired from both cars. He also asserts that no shots were fired from the gray vehicle, which challenges the truth of the contents of the paragraph.

At the *Franks* suppression hearing, Detective Michael Daniels testified that Sharon Hollingsworth's "vehicle descriptions were general . . . [b]ut they didn't change throughout her interviews. But they didn't match extremely close to some of the other witnesses that gave us vehicle descriptions." Daniels also testified that "from [Hollingsworth's] knowledge of vehicles and what she thought she saw that her descriptions of the vehicles has been fairly consistent." Daniels was shown some photographs, which are not in the record on appeal, and was asked to identify them. He testified:

"A. These are pictures of a Chevy that is parked behind 429 Topping.

"Q. Are those the pictures or at least copies of those pictures being shown to Sharon Hollingsworth in this video?

"A. They could have been. I really don't know."

Still referring to a video of Sharon Hollingsworth, which also is not in the record on appeal, Daniels was asked and answered the following questions:

"Q. Now, she is referring to the second vehicle. What's your understanding of the second vehicle involved?

"A. There were two vehicles that we had descriptions of that pulled up on either side or around the sides of her vehicle and then turned and followed her. As they were going back across Shawnee Mission Parkway the wrong direction, a truck driver told us that the vehicle[s] split and went on either side of his truck. One was described like a Chevy Caprice, a larger vehicle, and one was a smaller, maybe, like Sharon says, a Chevy or Oldsmobile-type vehicle.

"Q. In the second vehicle, Ms. Hollingsworth stated she doesn't know whether there were shots coming from that vehicle?

"A. That's correct.

"Q. When Ms. Hollingsworth is talking about the car that did the shooting, that's what we—commonly been referring to in this case as the first car?

"A. Right.

"Q. And the second car would be the car we don't know if there was any shooting; correct?

"A. That's right.

"Q. I'm going to approach and show you again Defendant's Exhibit G and F [photographs not in the record on appeal]. Would you agree with me that the car depicted in Defendant's Exhibit G and F is consistent with what has come to be known as the second car?

"A. Yes.

. . . .

"Q. So the vehicle depicted in Defendant's Exhibit G and F, could you tell the court whose vehicle that is?

"A. I don't recall who the registration is. Sharon says that it is Wee-Wee, and right now I can't even remember what his real name.

"Q. Frederick Johnson I think?

"A. Okay, that's it.

"Q. So Sharon says that is Wee-Wee's car?

"A. That's what she says, yes.

"Q. Sharon also says we don't know if there was gunfire coming from that car?

"A. That's what she told us, yes.

"Q. And Sharon places John Francis in the passenger seat of the car that was doing the shooting; correct?

"A. Yes."

The defendant's first contention is: "Omission of the fact th[at] Sharon Hollingsworth misidentified the vehicle which was owned by the Defendant's ex-wife and was later searched displays a reckless disregard for the truth by the affiant." It appears that defendant's contention refers to Hollingsworth's belief that the vehicle had belonged to Frederick Johnson, but her belief as to the ownership has no relevance to the establishment of probable cause to search defendant's residence. Second, he complains that the affidavit did not contain the information that "Sharon Hollingsworth did not identify the car as the one from which gunfire was emanating." But at the *Franks* hearing, defense counsel established through questioning of Detective Daniels that Sharon Hollingsworth stated she did not know whether shots were fired from the second vehicle. Hollingsworth did tell police that Francis was in the first vehicle and she knew shots were fired from it. The significance defendant would attach to what he views as an omission is that, if no shots were fired from the second vehicle, "there was no reason for officers to believe the car would contain firearms, bullet casings, or gunpowder residue." In other words, with regard to the search of his residence, he contends there is no link between the Chevrolet Caprice and the evidence sought from his house. He fails, however, to take into account that the Chevrolet Caprice matched the description of one of the vehicles that was at the scene of the crime and the possibility that both Francis and the Caprice could have been at the scene of the murder with someone else driving the Caprice.

Defendant also challenges the date on the affidavit. The affidavit was subscribed and sworn before the judge on February 23, 1998. In Paragraph 6, on the subject of Sharon Hollingsworth's identification of defendant, the affiant states: "As of the most recent interview which occurred on today's date Sharon Hollingsworth indicates . . . ." Without citing his support, Francis asserts that the interview took place on February 21, 1998. The apparent source for defendant's assertion is the following exchange between defense counsel and Daniels at the *Franks* hearing, which took place in July 2003:

"Q. There w[ere] basically three interviews; correct?
"A. Yes.
"Q. The 18th, 19th, and 21st of February; is that correct?
"A. That sounds about right."

Daniels did not say that February 18, 19, and 21 were the exact dates of the interviews; he said those dates sound "about right." Daniels' equivocal response 5½ years later certainly did not rule out the possibility that the interview occurred on February 23 rather than February 21.

Paragraph 11 of the affidavit states that a search warrant for the vehicle parked behind defendant's residence was obtained on January 21, 1998. The trial court found that the January date should have been February 21, 1998, but was not a deliberate falsehood. On appeal, Francis attacks the statement of the month as false but does not contend that it was deliberate. "Allegations of negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171.

The trial court's findings are based on substantial evidence, and this court on review accepts those findings. We conclude, as did the trial court, that the statements and omissions challenged by defendant do not rise to the level of deliberate falsehoods or reckless disregard for the truth.

Defendant also argues the trial court erred in applying Kansas law in determining the validity of the search warrant. At the threshold, defendant argued in the district court that Missouri law ought to govern the validity of the search warrant, which was issued in Missouri, and its execution, which occurred in Missouri. On the ground that Kansas, Missouri, and federal law are in accord on the issues raised by defendant, the trial court declined to exercise a choice of law. No choice of law question is presented when the laws of the implicated states do not differ on substantive issues. *AT&SF Ry. Co. v. Stonewall Ins. Co.*, 275 Kan. 698, 731, 71 P.3d 1097 (2003). Without showing that application of Missouri law would make a difference, Francis reiterates on appeal his argument that Missouri law governs. Our examination of the substantive issues defendant raised with regard to the search has shown that the Fourth Amendment governs them. The United States Constitution is the supreme law of the land, which binds the courts in every

state. See U.S. Const. art. VI, cl. 2; *Rose v. Via Christi Health System, Inc.*, 279 Kan. 523, 525, 113 P.3d 241 (2005). Hence, the trial court correctly concluded that no choice of law is presented in this case where the laws of Kansas and Missouri derive from the Fourth Amendment and do not differ on the substantive issues.

## ADMISSION OF CERTAIN EVIDENCE

Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question. *State v. Franklin*, 280 Kan. 337, Syl. ¶ 1, 121 P.3d 447 (2005).

Guns. Three guns seized from Francis' residence were admitted into evidence—a .38 Special Taurus handgun, a Cobray 9 mm, and a Feather .22 rifle. Francis filed a motion in limine asking the trial court to exclude the guns from evidence. In the motion, he argued that, because testing failed to link any of the guns to the crime, they were irrelevant, and, in addition, they would be highly inflammatory evidence. The trial court denied the motion. Defendant objected at trial to introduction of the guns, and the trial court overruled the objection, stating that the probative value outweighed the prejudicial effect.

On appeal, he contends that the guns should have been excluded as more prejudicial than probative because none of the firearms could be scientifically linked to the crime. He relies on *State v. Lumley*, 266 Kan. 939, Syl. ¶ 5, 976 P.2d 486 (1999), which states:

"When a question arises as to whether evidence at trial is unfairly prejudicial, the trial court has an obligation to weigh the probative value of the evidence. When the prejudicial effect of the evidence on the trier of fact outweighs the probative value of the evidence, the evidence should be excluded."

The trial court believed that the evidence of the guns was probative or relevant. K.S.A. 60-401(b) defines relevant evidence as evidence having any tendency in reason to prove any material fact. K.S.A. 60-407(f) makes all relevant evidence admissible. The State argues that the Taurus handgun was relevant because it could have fired the bullet that was removed from Hollingsworth's body. The firearms expert testified that the bullet could have been fired from

the Taurus or from some "other firearm possessing the same rifling specifications." But the firearms expert admitted the extreme thinness of any connection between the Taurus and the murder by testifying that the number of firearms with the same rifling specifications could number in the thousands, even millions. The State also asserts that the Cobray was not eliminated as a weapon involved in the shooting. But the firearms expert testified, "There were no bullets or cartridge cases fired from that weapon." Thus, the Taurus is the only one of the three guns connected to the shooting by any evidence and that connection is a very weak one; at best it shows that a gun in the defendant's possession could not be eliminated as the murder weapon. But this court has said that " '[w]here a weapon found in the possession of a defendant is identified as being similar to one used in the crime, the lack of positive identification goes to its weight as evidence and not to its admissibility.' " *State v. Mitchell*, 220 Kan. 700, 704, 556 P.2d 874 (1976) (quoting *State v. Ponds and Garrett*, 218 Kan. 416, Syl. ¶ 6, 543 P.2d 967 [1975], *overruled on other grounds State v. Warren*, 230 Kan. 385, 635 P.2d 1236 [1981]). Likewise, here the lack of positive identification goes to the weight and not the admissibility of the Taurus.

"[A]s a rule of necessity the trial judge may exclude any evidence which may unfairly prejudice the defendant. Where the probative value is substantially outweighed by the risk of unfair prejudice, even relevant evidence may be excluded by the judge." *State v. Leitner*, 272 Kan. 398, Syl. ¶ 5, 34 P.3d 42 (2001). Francis argues that if the Taurus handgun was relevant and, therefore, otherwise admissible, it should have been excluded because it was extremely prejudicial impeachment of his character that substantially outweighed any probative value. The State's position is that introduction of the Taurus was not unfairly prejudicial because it did not call for an improper emotional response from the jury. The introduction of a possible murder weapon into evidence in a murder trial typically would not be designed to elicit a response from the jury that might cause it to base its decision on emotion rather than reason. We conclude the trial court did not commit error in admitting the Taurus handgun into evidence.

The Cobray and the .22 caliber weapon, however, were not relevant, having no tendency in reason to prove any material fact. The trial court abused its discretion in admitting them.

Errors that do not affirmatively cause prejudice to the substantial rights of the defendant do not require reversal where it appears from the whole record that substantial justice has been done. *State v. Kendall,* 274 Kan. 1003, 1010, 58 P.3d 660 (2002). The question in the present case is whether admission of the 9 mm Cobray and the Feather .22 rifle affected the jury's decision. The critical issue for the jury would have been the credibility of Sharon Hollingsworth, who identified Francis as being at the murder scene. It is difficult to see how admission of these two guns, which were in the defendant's possession but not linked to the shooting, might have bolstered Hollingsworth's credibility. Nor do we agree that such evidence was extremely prejudicial impeachment of the defendant's character, or highly inflammatory. The weapons were not relevant, but their admission into evidence did not prejudice defendant's substantial rights.

Ammunition and pamphlet. Francis complains that a shoebox containing ammunition, and a pamphlet titled "The Commando Mark Mini Pistol .45 caliber and 9mm" were admitted into evidence. Francis filed a motion in limine asking the trial court to exclude the ammunition from evidence. In the motion, he argued that, because testing failed to link any of the ammunition to the crime, it was irrelevant, and, in addition, it would be highly inflammatory evidence. The trial court denied the motion, stating that the evidence was probative and that the probative value outweighed the prejudicial effect. Defendant objected at trial to introduction of the ammunition and the pamphlet. His objection was overruled.

Although some of the ammunition was of a caliber used in the shooting of Hollingsworth, there was no evidence linking any of the ammunition with the shell casings found at the crime scene. And, if the pamphlet relates to any of defendant's guns, it would be to the Cobray, which was not relevant to the murder. Thus, with no tendency in reason to prove any material fact, neither the ammunition nor the pamphlet was relevant. The trial court abused its

discretion in admitting them. It does not seem likely, though, that admission of the ammunition and the pamphlet, when weighed against the other evidence in this case, would have affected the jury's decision.

Testimony about defendant's home monitoring device. Francis states that he was on house arrest when the murder occurred and was subject to electronic monitoring. He complains of the admission of evidence regarding the electronic home monitoring equipment.

In his motion in limine, defendant did not mention electronic monitoring. He stated that various trial witnesses would testify that he was on house arrest at the time of the murder and sought to prohibit them "from mentioning the underlying reason the Defendant was on house arrest" because the reason was irrelevant and prejudicial. The trial court granted the request. Francis does not complain on appeal that witnesses mentioned the underlying reason for his house arrest.

On appeal, he argues that admission of the testimony of Tim Hughley, the customer service manager for the company providing the electronic monitoring services, amounted to evidence of another crime in violation of K.S.A. 60-455. A party must make a timely and specific objection to the admission of evidence at trial in order to preserve the issue for appeal. K.S.A. 60-404; *State v. Kunellis*, 276 Kan. 461, 477, 78 P.3d 776 (2003). But at trial defendant made no objection to Hughley's testimony. In fact, defense counsel sought and was granted permission to show the witness' records to the jury and questioned the witness extensively about the records in order to make the point that the monitoring device may not have been working properly. Francis is precluded from raising this argument on appeal.

Photo lineup. Defendant complains of the admission into evidence of the photo lineup shown to Sharon Hollingsworth by Detective Daniels. Hollingsworth testified that she picked the defendant from a photo lineup shown to her by Daniels. Daniels testified that she picked the defendant's photograph from a lineup of six photos he showed her. When the State sought to have the photo lineup admitted into evidence, defendant offered to stipulate

that she identified him and objected that the mug-shot photos were evidence of another crime. The State offered to cover the bottom portion of the photos, and the trial court agreed to admit the lineup with the modifications. The State redacted "Police Department" from the photos. Defendant objected on the ground the lineup was cumulative to the testimony that Hollingsworth picked Francis' photo from the array and irrelevant. The trial court overruled the objection.

On appeal, defendant pursues his argument that the lineup was cumulative and irrelevant. By irrelevant, he seems to mean cumulative; he contends that admission of the lineup was "irrelevant given the previous testimony and offer to stipulate." Hollingsworth's identification of Francis is a critical aspect of the State's case. The photo array from which she selected defendant's picture was highly relevant, and its relevance was not affected by testimony on the subject. With regard to the offer to stipulate, it is long established that an offer to stipulate by either party to a criminal action need not be accepted by the other. *State v. Donesay*, 265 Kan. 60, 77, 959 P.2d 862 (1998). Francis' offer to stipulate in no way affected the relevance of the lineup. On the question whether the lineup was inadmissible because it was cumulative, the only case the defendant cites is *State v. Shelby*, 277 Kan. 668, 679, 89 P.3d 558 (2004), which does not help his cause. In *Shelby*, the court stated that the admission of photographs was "necessary to corroborate the testimony of the officer and the coroner" and concluded that the admission was not an abuse of the trial court's discretion. 277 Kan. at 679. We reject defendant's argument and find no abuse of discretion by the trial court.

Three-Way Telephone Call. Sharon Hollingsworth testified that Corey Shannon telephoned her and she made it a three-way call by telephoning Francis. Hollingsworth kept quiet in order to make Francis think that he had received a direct call from Shannon. When Hollingsworth was asked what she heard defendant say, he objected on the ground of hearsay. The trial court allowed the testimony when the prosecutor affirmed that it involved a criminal threat. Hollingsworth testified she heard Francis tell Shannon that "if he did not get Clem, . . . he would get the next thing closest

to him." Hollingsworth testified that the defendant meant "he was going to kill me."

On appeal, defendant contends that the trial court abused its discretion in allowing Hollingsworth to testify about what she heard him say to Shannon because her testimony was hearsay. The State argues that the testimony is admissible as a hearsay exception—a declaration against interest under K.S.A. 60-460(j). K.S.A. 60-460(j) provides in part:

"Evidence of a statement which is made other than by a witness while testifying at the hearing offered to prove the truth of the matter stated is hearsay evidence and inadmissible except . . . a statement which the judge finds . . . so far subjected the declarant to . . . criminal liability . . . that a reasonable man in the declarant's position would not have made the statement unless he or she believed it to be true."

Defendant, relying on *State v. Prince*, 227 Kan. 137, 146, 605 P.2d 563 (1980), argues that the conversation, which as far as he knew was strictly between his friend Shannon and him, did not place him in the position of criminal liability so as to make the statement a declaration against interest. In *Prince*, the defendant, who was charged with three robberies of Church's Fried Chicken in Wichita, sought to introduce evidence that one jail inmate heard another jail inmate say he had robbed Church's Fried Chicken several times during the period at issue. The inmate who said he robbed the business was unavailable for cross-examination, and the trial court excluded the evidence on that ground. This court concluded the evidence was properly excluded because "[a]n incriminating conversation between two prisoners sitting in a cell, without sufficient evidence they expected the conversation to be reported does not place the declarant in the position of possible criminal liability so as to make the statement a declaration against interest." 227 Kan. at 146-47. The court added: " 'This is not a case where an inmate in a penal institution comes forward to take the entire blame for a crime, or where accomplices are involved.' " 227 Kan. at 147 (quoting *State v. Quick*, 226 Kan. 308, 318, 597 P.2d 1108 [1979]).

In the present case, unlike in *Prince*, the statement at issue was made by the defendant, a party to this criminal action. In *Prince*,

the declarant was not a party to the action. K.S.A. 60-460(g) governs admissions by parties:

"Evidence of a statement which is made other than by a witness while testifying at the hearing offered to prove the truth of the matter stated is hearsay evidence and inadmissible except . . . as against a party a statement by the person who is the party to the action in the person's individual . . . capacity . . . ."

As noted in the analysis of Subsection (g), Admissions by Parties:

"There has been a tendency to confuse 'declarations against interest' with 'admissions.' The basic rules with respect to the two classes of hearsay are different. The first has to do with a nonparty declarant, and the declaration or statement was formerly admissible only where the declarant was dead or otherwise unavailable as a witness. . . . The latter (admissions) are admissible if relevant, not because they are against the interest of the party making the statement but because the statement would be helpful to the other party to the action. Admissions have always been admissible, whether the party is dead or living or whether or not the party is present at the trial. No element of necessity exists or ever existed in the case of the admission, or statement made out of court by a party to the action." 4 Gard & Casad, Kansas Law and Practice, Kansas C. Civ. Proc. 4th Annot. § 60-460(g), p. 667 (2003).

Francis' statement to Shannon fits into the category of 60-460(g), an admission by a party, rather than into that of 60-460(j), a declaration against interest. The trial court properly admitted the evidence.

## ALLOWING A PROSECUTION WITNESS TO REMAIN IN THE COURTROOM

At the pretrial conference, which occurred several days before the jury trial began, the prosecutor asked the trial judge to allow the case detective, Mike Daniels, to remain in the courtroom during trial to assist "if the need arises." Defense counsel objected on two grounds. He did not want Daniels sitting at counsel table and having credibility imputed to him by proximity with the prosecution table. And he did not want Daniels, "a material witness in this case," to be able to "adjust" his testimony based on what he heard while in the courtroom. The prosecutor denied having any intention of having Daniels sit at counsel table. The trial judge struck a compromise:

"I'm sensitive to [defense counsel's] objection, so I guess what I'm saying, because the complexity of the case and the need for him to help in the organization of exhibits, for that limited purpose, I will allow him, but to the extent during the trial that he is not needed for that purpose, then he should be outside the courtroom. So I would like you to minimize his courtroom appearance as much as you possibly can."

On appeal, Francis complains that he was prejudiced by Daniels' "continuous presence" "in close proximity to the prosecution table throughout the trial." In other words, Francis claims that the State defied the trial court's pretrial ruling. But Francis has failed to direct the court's attention to where in the record he complained either of how much time Daniels spent in the courtroom or how close Daniels sat to the prosecuting attorney. And the State suggests that no objection was raised.

Sequestration of witnesses on a request of the defendant or the State is mandatory at preliminary hearings pursuant to K.S.A. 22-2903. At trial, however, sequestration is not a right but is committed to the sound discretion of the trial court. In the absence of evidence that the presence of a witness prejudiced the defendant, the trial court's decision will not be reversed on appeal. *State v. Kirtdoll*, 281 Kan. 1138, Syl. ¶ 5, 136 P.3d 417 (2006); *State v. Heath*, 264 Kan. 557, 588-89, 957 P.2d 449 (1998). In the present circumstances, in the absence of any indication in the record when and where Daniels was in the courtroom, no prejudice to the defendant can be shown.

## REFUSING TO ALLOW DEFENSE COUNSEL TO ARGUE THE TIMING OF THE TRIAL IN CLOSING

Clem Hollingsworth was killed in February 1998. Francis was tried for the murder in November 2003. During defense counsel's closing argument, he stated:

"You saw Detective Daniels' interview with Mike Williams. We all had to sit through it. And I asked him on cross-examination, Why, did you get any new evidence since 1998? And the only thing he could come up with is Tony Gillihan, which really isn't new evidence. So you're going to have to decide for yourselves back in that jury room why are we just now dealing with John Francis."

The State objected on the ground of relevance. Defense counsel defended his statement as relevant: "Cause you can look at Detec-

tive Daniels in that Mike Williams' interview and decide why we are dealing with this case." The trial judge sustained the objection, telling the jury to disregard defense counsel's statement.

An edited video recording of Daniels' interview of Mike Williams, who was a suspect and an unavailable witness, was played during trial. Defense counsel questioned Daniels about what had been seen on the recording:

"Q. You told Mike Williams you had people who saw him there—by there. I'm assuming you are referring to the scene?

"A. That's correct.

"Q. And who was it that saw him at the crime scene?

"A. No one.

"Q. So that was a lie?

"A. Yes, it was."

The defendant's position is that "[t]he implication from the interview with Williams is that the police still did not have any idea nor any evidence of who was shooting at [Hollingsworth] the night of the murder."

Defense counsel seems to believe that the jury was told to disregard what he said about Daniels' interview of Williams and about Gillihan as well as his suggestion that it was the jury's obligation to decide why so much time elapsed between the murder and the trial. But it appears that the State objected, and the trial court told the jury to disregard only defense counsel's saying, "So you're going to have to decide for yourselves back in that jury room why are we just now dealing with John Francis." And the State believes that the trial court's instruction applied only to this last sentence.

The scope of oral argument generally lies within the sound discretion of the trial court, and the court's rulings will form no basis for a reversal absent a showing of abuse of discretion. *State v. Kuone*, 243 Kan. 218, 234, 757 P.2d 289 (1988). In *Kuone*, a child sexual abuse case, defense counsel was prohibited from asking the jury during closing argument why authorities had not investigated, apprehended, and charged any other persons with whom the victim indicated she had had sexual contacts. This court approved the trial court's giving "the defendant broad leeway to stress F.S.'s statements relating to sexual contacts with persons other than the de-

fendant" but prohibiting "speculation upon why the State had failed to apprehend and prosecute other individuals." 243 Kan. at 233-34. "The matter of why others had not been charged was outside of the evidence, outside of the issues in this trial, and wholly immaterial." 243 Kan. at 234. Likewise, in the present case, Daniels' interview of Williams and Gillihan's testimony were part of the evidence, but speculation as to why several years elapsed between Hollingsworth's murder and Francis' trial was outside the evidence and immaterial. The trial court did not abuse its discretion in instructing the jurors to disregard defense counsel's urging them to decide why there had been a delay.

## JURY INSTRUCTIONS

Over defendant's objection, the trial court gave the following two instructions on aiding and abetting:

"A person who, either before or during its commission, intentional[ly] aids, abets, advises, counsels or procures another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

See PIK Crim. 3d 54.05.

"A person who intentionally aids, abets, advises, counsels or procures another to commit a crime is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the other crime was reasonably foreseeable."

See PIK Crim. 3d 54.06.

Francis contends that the instructions were not supported by the evidence. The evidence in this case, however, presents a classic situation in which aiding and abetting instructions are appropriate. A car with several occupants pulled up beside the driver's side of the car in which Hollingsworth was riding, Francis was in the front passenger seat of the car that pulled alongside, several arms were outside its windows, and at least five different weapons were fired at the car in which Hollingsworth was riding. Defendant was in a position to shoot at the car Hollingsworth was riding in, and from this evidence it reasonably may be inferred that several persons shot at it.

Francis contends that the State's theory and argument were not that he aided and abetted in Hollingsworth's murder but rather that he fired the final two shots of the barrage of shots and that the final two shots fatally wounded Hollingsworth. In opening statement, the prosecuting attorney did tell the jury the State believed the evidence would show that Sharon Hollingsworth saw Francis fire the fatal shots. But the evidence did not bear out the prosecutor's statement. The fatal shots were not identified, and, therefore, Sharon Hollingsworth did not identify Francis as the shooter of the fatal shots. As is firmly rooted in the law and as the jury was instructed: "Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded." PIK Crim. 3d 51.06; see *State v. Reser*, 244 Kan. 306, 316, 767 P.2d 1277 (1989).

Given the trial court's intention to instruct on aiding and abetting, Francis requested an instruction on "mere association" from *State v. Green*, 237 Kan. 146, Syl. ¶ 4, 697 P.2d 1305 (1985). According to defendant, the instruction would state that "mere association with a principal who actually committed the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as aider or abettor." The trial judge declined the request, stating that mere association is ruled out by the requirements of intent and reasonable foreseeability in the instructions on aiding and abetting. The trial judge's ruling echoes the Comment to PIK Crim. 3d 54.05:

"Mere association with the principals who actually commit the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider and abettor. *State v. Green*, 237 Kan. 146, 697 P.2d 1305 (1985). This language from *Green*, however, may properly be refused as an additional instruction by the trial judge, since PIK 3d 54.05 clearly informs the jury that intentional acts by a defendant are necessary to sustain a conviction for aiding and abetting. *State v. Hunter*, 241 Kan. 629, 639, 740 P.2d 559 (1987); *State v. Scott*, 250 Kan. 350, 361, 827 P.2d 733 (1992); *State v. Ninci*, 262 Kan. 21, 46, 936 P.2d 1364 (1997); *State v. Jackson*, 270 Kan. 755, 19 P.3d 121 (2001); *State v. Pink*, 270 Kan. 728, 20 P.3d 31 (2001)." Comment, PIK Crim. 3d 54.05.

Nonetheless, defendant argues that the trial court erred in not instructing the jury on mere association because the jury's questions showed it was misled by the instructions it received on aiding and abetting. It is established that, if the instructions taken as whole properly and fairly state the law as applied to the facts of the case and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error. *State v. Mays*, 277 Kan. 359, 378-79, 85 P.3d 1208 (2004). The jury wrote the following two questions: "Can we have a definition of 'aids and abets'?" and "Is having knowledge of a murder before it is committed and not reporting it aiding and abetting as in Jury instruction 11." These questions may manifest the jury's attempt to become familiar with legal concepts in order to apply them to the facts, but they do not show that the jury was misled. The defendant has not shown that a jury reasonably could have been misled by the instructions given. Hence, the defendant has not shown that the trial court erred in refusing to give an additional instruction on mere association.

## RESPONSES TO TWO JURY QUESTIONS

The trial court's response to the jury's questions about aiding and abetting was the following: "Members of the Jury, In response to your Questions—there is no further definition or guidance the Court can give you on these questions." Defendant contends that the trial court erred in refusing to answer the second question— "Is having knowledge of a murder before it is committed and not reporting it aiding and abetting as in Jury instruction 11." He relies on *State v. Bandt*, 219 Kan. 816, 823-24, 549 P.2d 936 (1976), in which the court concluded that the trial judge's failure to give additional information to the jury was prejudicial.

*Bandt* should be distinguished from the present case on its facts. During deliberations in *Bandt* the jury sent word to the trial judge that it had a question, and, in accord with then-current practice, the jury returned to the courtroom. The question was whether defendant's guilt depended on whether he knew at the time of receiving stolen property that it was stolen. The trial judge refused to give further instruction but permitted counsel to present their conflicting statements of the law to the jury, including the prose-

cutor's erroneous opinion that "defendant would be guilty under the statute if at any time while the defendant had possession of the stolen articles he obtained knowledge that the items were stolen." 219 Kan. at 823. Thus, rather than directing the jurors' attention to the instructions, which accurately stated the law, the trial judge aggravated their confusion by exposing them to conflicting statements of the law, one of which was incorrect. In contrast, in the present case, the trial judge told the jurors that he could give them no further guidance in the matter. With no further guidance forthcoming, the jurors' recourse was to return to the guidance already given them—the instructions.

Francis also cites K.S.A. 22-3420(3), which provides:

"After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they may request the officer to conduct them to the court, where the information on the point of the law shall be given, or the evidence shall be read or exhibited to them in the presence of the defendant, unless he voluntarily absents himself, and his counsel and after notice to the prosecuting attorney."

" 'Under K.S.A. 22-3420(3) a trial court has a mandatory duty to respond to a jury's request for further information as to the law of the case. The manner and extent of the trial court's response rest in the sound discretion of the trial court.' " *State v. Sperry*, 267 Kan. 287, 311, 978 P.2d 933 (1999) (quoting *State v. Myers*, 258 Kan. 51, Syl. ¶ 1, 899 P.2d 1036 [1995]).

In this case, the trial judge believed that the second jury question sought further information on application of the law to the facts rather than further information as to the law of the case. The trial judge told counsel he would advise the jurors he could give them no further assistance on their questions because "[f]or the Court to answer the second question would be I think invading the province of the jury. That is their decision to make as applying the law to the facts of the case." The trial judge correctly perceived that the question whether certain facts constituted aiding and abetting asked the judge to do the jury's job of applying the law to facts; it did not request further information about the law. In the circumstances, the trial court did not have a mandatory duty to respond to the jury's request. And the response the trial court made was

not one with which no reasonable person would agree. See *State v. Moore*, 274 Kan. 639, 643, 55 P.3d 903 (2002). Thus, there was no abuse of discretion by the trial court.

## POSTTRIAL MOTIONS

The jurors reached a verdict in this case on November 10, 2003. On December 29, 2003, before he was sentenced, defendant filed a motion to dismiss on the ground that the State failed to disclose exculpatory evidence. Defendant complained that the State knew Tony Gillihan, a significant witness, suffered from posttraumatic stress disorder that caused him to confuse the events of his son's murder with the facts of defendant's case. Defendant presented evidence on the motion at a hearing on February 27, 2004. The trial court denied the motion. Francis contends the trial court erred in denying his motion to dismiss.

Defendant called two witnesses at the hearing—Paul Becker, United States Assistant District Attorney in the Western District of Missouri, and Michael Daniels, the lead detective in the present case. Becker prosecuted Gillihan on a federal matter, and Gillihan's testimony in the present case was a part of the consideration for his plea agreement in the federal case. Becker testified that he was frustrated with Gillihan, who in both cases constantly vacillated between wanting to cooperate and not wanting to cooperate. Daniels testified that immediately before Gillihan testified in Francis' trial, Gillihan told Daniels he had posttraumatic stress disorder and was confusing a couple of issues between his son's death and what he was going to testify about in Francis' trial. But at the hearing the trial court sustained the State's hearsay objection to Daniels' testimony.

As defense counsel stated at the hearing, Daniels was relating statements made to him by Gillihan not for the truth of the matter asserted in them but rather to show that the State, or an agent of the State, knew before Gillihan testified that he said he suffered from posttraumatic stress disorder that affected his ability to distinguish events of his son's murder from the facts pertaining to Hollingsworth's murder. Testimony is not inadmissible as hearsay evidence when it is not offered to prove the truth of the matter

asserted. *State v. Humphrey*, 267 Kan. 45, 54, 978 P.2d 264 (1999). The trial court erred in sustaining the State's objection to Daniels' testimony. Thus, this court will consider the testimony in evaluating Francis' contention that the trial court erroneously denied his motion to dismiss.

In denying defendant's motion, the trial court noted that Gillihan's testimony at trial was "strikingly consistent" with his preliminary hearing testimony and "with what he had told the police even years before the preliminary hearing." On appeal, Francis argues that Gillihan's statement to Daniels about his mental disorder and confusion was material impeachment information that the State was obligated to disclose to him and that the State's failure to disclose the information violated *Giglio v. United States*, 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763 (1972), *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), and K.S.A. 2005 Supp. 22-3212. Subsection (g) of the statute provides that if, during trial, a party discovers additional material previously requested, it must promptly notify the other party or court of its existence. To remedy a failure to comply, the trial court "may enter such other order as it deems just under the circumstances." K.S.A. 2005 Supp. 22-3212(g).

An appellate court reviews the ruling on a motion to dismiss criminal charges as a sanction for prosecutorial action or inaction for abuse of discretion. *State v. Bolen*, 270 Kan. 337, 342-43, 13 P.3d 1270 (2000). Where there has been no showing that the defendant suffered actual prejudice as a result of a prosecutor's misconduct, and alternative means of sanctioning the prosecutor exist for the violation, dismissal of pending charges with prejudice may constitute an abuse of discretion by the trial court. 270 Kan. at 343. With regard to denial of a posttrial motion for new trial, the court has stated that, if a constitutional right of the defendant has been violated, the trial court's discretion to deny the motion is limited and there is a greater reason for the trial judge to articulate his or her reasoning. *State v. Mathis*, 281 Kan. 99, 103-04, 130 P.3d 14 (2006).

"Evidence materially affecting credibility of a key prosecution witness may be considered as exculpatory evidence." *State v.*

*Quinn,* 219 Kan. 831, Syl. ¶ 3, 549 P.2d 1000 (1976). Gillihan, whose eventual willingness to testify was the impetus for the State's filing charges against the defendant, was a key prosecution witness. The general rules regarding exculpatory evidence were discussed in *State v. Aikins,* 261 Kan. 346, 380-86, 932 P.2d 408 (1997):

> " 'A defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is material to the guilt or innocence of the defendant. Suppression of such evidence is a violation of the defendant's Fourteenth Amendment due process rights. *Brady v. Maryland,* 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). Prosecutors are under a positive duty, independent of court order, to disclose exculpatory evidence to a defendant.' *State v. Carmichael,* 240 Kan. 149, 152, 727 P.2d 918 (1986)." 261 Kan. at 381.

We know from Daniels' testimony at the motion hearing that just minutes before Gillihan testified at Francis' trial he told Daniels about having posttraumatic stress disorder and "confusing a couple issues between his son's death and what he was going to testify about." We also know from Daniels' testimony that the prosecuting attorney had been in the room with him and Gillihan for a time before Gillihan's testimony. But Daniels was unable to remember whether the prosecutor was present when Gillihan talked about posttraumatic stress disorder, and no other evidence was elicited on the subject. For the purpose of analyzing this issue, it is not important whether the prosecutor was present when Gillihan talked about having posttraumatic stress disorder because *Brady* suppression occurs even when the government fails to turn over evidence that is not known to the prosecutor if it is known to police. *Kyles v. Whitley,* 514 U.S. 419, 438, 131 L. Ed. 2d 490, 115 S. Ct. 1555 (1995). The evidence must be clearly exculpatory and the evidence must be material so that its suppression was clearly prejudicial to the defendant in order for the court to grant a *Brady* motion. *Aikins,* 261 Kan. at 382 (citing *State v. Humphrey,* 258 Kan. 351, 355, 905 P.2d 664 [1995]).

Gillihan was a key witness in this case. He gave important testimony, namely that Francis was one of several people who wanted to pay Clem Hollingsworth's bond in order to get him released from jail and that they had assured Gillihan he would not lose any money because he would be off the bond when Hollingsworth's

body was found. A factfinder reasonably could infer from this testimony that Francis and several people intended to kill Hollingsworth once he was released from jail. Gillihan's reliability was important. Evidence that Gillihan said he suffered from a disorder that affected his ability to distinguish events of his son's murder from the facts pertaining to Hollingsworth's murder might have affected his credibility had he been questioned about it on cross-examination.

In *Youngblood v. West Virginia*, 547 U.S. 867, 869-70, 165 L. Ed. 2d 269, 126 S. Ct. 2188 (2006), the United States Supreme Court stated that what is required for a showing of materiality is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. But a demonstration that disclosure of the suppressed evidence ultimately would have resulted in the defendant's acquittal is not required. In the words of the Supreme Court, "[t]he reversal of a conviction is required upon a 'showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' [*Kyles*, 514 U.S.] at 435." 547 U.S. at 870.

On its face, Gillihan's statement that he was confusing a couple of issues in his son's death with ones in this case seems to undermine the credibility of his testimony. But closer scrutiny does not confirm the impression. Gillihan did not witness the murder and had no knowledge of the actual murder. The materiality of his testimony was only in showing that Francis, along with several associates, intended to kill Hollingsworth. His significant testimony was that, in trying to convince Gillihan to discount Hollingsworth's bond, Francis and his associates stated that Hollingsworth would be dead shortly after he was released from jail. These circumstances—would-be murderers trying to talk the bondsman into having their target released from jail so that they can kill him— surely are not commonplace, and it is highly unlikely that circumstances similar enough to be confused occurred in the murder of Gillihan's son. It would be even less likely that the would-be murderers of Gillihan's son would talk to Gillihan in trying to get their target released from jail in order to kill him.

Defendant failed to develop a record of what issues Gillihan claimed to be confusing. From the existing record, the court reasonably may infer that whatever confusion Gillihan might have had did not affect his testimony about being visited by Francis and, therefore, would not have been useful in impeaching the witness' significant testimony. Moreover, as noted by the trial judge, Gillihan's testimony was consistent throughout—during the police investigation, at preliminary hearing, and at trial. The consistency of the witness' account would have been a powerful rehabilitation tool if his credibility had been impeached. Thus, it is not a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the trial would have been different. Due process was not violated, and the trial court did not err in refusing to grant Francis' motion to dismiss.

## CUMULATIVE ERRORS

Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant. *State v. Holmes*, 278 Kan. 603, 641, 102 P.3d 406 (2004).

Because the only meritorious issue in this case was the admission of certain irrelevant evidence, the circumstances do not present multiple trial errors to consider collectively.

## SUFFICIENCY OF EVIDENCE

Francis contends that there was insufficient evidence to support his conviction of first-degree murder. When the sufficiency of the evidence is challenged in a criminal case, this court reviews all the evidence, viewed in the light most favorable to the prosecution. The evidence is sufficient if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. In its review, the court does not pass upon the credibility of witnesses or weigh conflicting evidence. *State v. Lowe*, 276 Kan. 957, 965, 80 P.3d 1156 (2003).

Francis argues that the only evidence tying him to the crime scene was Sharon Hollingsworth's testimony, and he questions her credibility. He also questions Gillihan's credibility. As stated, however, the court does not pass upon the credibility of witnesses in its review of the evidence.

The evidence showed that Francis tried to persuade Gillihan to discount Clem Hollingsworth's bond by telling Gillihan that he would not be obligated for the money very long, just until Hollingsworth's body was found. Francis could have known when Hollingsworth's mother got him released from jail because Francis' aunt was notified. Sharon Hollingsworth identified Francis as one of the persons in the vehicle that drove alongside her and her son and fired into their car. Francis' house-arrest monitor was disabled at the time of Clem Hollingsworth's murder. This evidence, viewed in the light most favorable to the prosecution, convinces the court that a rational factfinder could have found Francis guilty beyond a reasonable doubt of the first-degree murder of Clem Hollingsworth.

Affirmed.