NOT DESIGNATED FOR PUBLICATION

No. 117,531

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JOHN F. FRANCIS,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Johnson District Court; JAMES CHARLES DROEGE, judge. Opinion filed March 20, 2020. Affirmed.

*Richard Ney*, of Ney, Adams & Miller, of Wichita, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., BUSER and STANDRIDGE, JJ.

BUSER, J.:  In 2003, John Francis was convicted of first-degree murder in the killing of Clem Hollingsworth. In 2006, his conviction and sentence were upheld by our Supreme Court on direct appeal. *State v. Francis*, 282 Kan. 120, 122, 145 P.3d 48 (2006) (*Francis I*). Since that time, Francis has filed two K.S.A. 60-1507 motions for postconviction relief and other assorted pro se motions.

This is an appeal of the district court's denial of Francis' motion to amend his second K.S.A. 60-1507 motion (hereinafter motion to amend) and his pro se "K.S.A. 60-

1

260 Motion for Relief from Judgment" (hereinafter motion for relief). These two motions taken together sought to justify Francis adding a fraudulent waiver of conflict claim to his motion to amend due to newly discovered evidence that Francis was actually innocent of murder. Upon our review, we find no error in the district court's denial of the second motion or the motion for relief.

### FACTUAL AND PROCEDURAL BACKGROUND

The following is our Supreme Court's detailed factual summary of evidence presented at Francis' murder trial:

"On February 18, 1998, Clem Hollingsworth IV died as the result of a gunshot wound which he sustained while a passenger in the back seat of a car driven by his mother. The shot was fired from another vehicle. The State's theory was that Hollingsworth was killed in revenge for the murder of Frederick Johnson.

"About 8 months earlier, in June 1997, Clem Hollingsworth shot and killed Frederick Johnson and shot and wounded Jason Smith. Hollingsworth was arrested on June 20, 1997, and charged with Johnson's murder. On February 17, 1998, Hollingsworth's mother, Sharon Hollingsworth, paid the bond to secure her son's release from jail. Among the people who were notified pursuant to the Missouri victims' rights statute of Hollingsworth's release was Frederick Johnson's mother. Hollingsworth was shot and killed in the early morning hours of February 18.

"Frederick Johnson was the brother of Richard Johnson and the cousin of the defendant, John Francis. Hollingsworth and Francis were friends. At the time of Frederick Johnson's death, Corey Shannon, another friend of Hollingsworth and Francis, was incarcerated in Missouri. A few weeks after Johnson's murder, Sharon Hollingsworth telephoned Shannon, then telephoned Francis as if the call were coming directly from Shannon, and listened to Shannon and Francis talk about the murder. Francis told Shannon that if he did not get Clem Hollingsworth, 'he would get the next thing closest to him.'

"In early February 1998, before Hollingsworth's mother paid his bond, the defendant along with several other people had visited James 'Tony' Gillihan at the KC

2

Bail Bonding Company. They wanted to pay Hollingsworth's bond and get him released. They did not have enough money to pay the bond but urged Gillihan to let them pay less, saying, 'You're not going to be on the bond very long.' When Gillihan said he would not make the bond for the $5,000 they were offering, Francis said, 'That's the motherfucker who killed my cousin a couple weeks ago,' and reiterated that Gillihan would only be on the bond a couple of days. Gillihan refused to be involved. Then someone with Francis offered another $2,500 and said, 'Don't worry about [it]; you're not going to lose anything. As soon as they find his body, you're off the bond.' Later, after hearing that Hollingsworth had been killed, Gillihan called the TIPS Hotline.

"Hollingsworth was released from jail at approximately 7:30 the evening of February 17. His mother picked him up, and they went to her house. After he showered, they went to visit relatives. At approximately midnight they picked up her friend Karen McCoy when she got off work. The three went to Harrah's in North Kansas City. As they were going into Harrah's, a young man recognized Clem Hollingsworth and greeted him.

"At approximately 3 a.m., they left Harrah's with Sharon Hollingsworth driving, McCoy in the front passenger seat, and Clem Hollingsworth in the back seat. They drove south on I-35 and exited at the Shawnee Mission Parkway ramp. At the yield sign to get on Shawnee Mission Parkway westbound, a car with bright headlights came up behind them. As Sharon drove onto the parkway, the car with the bright lights drove quite close beside her—over the line into her lane. Sharon recognized the defendant in the front passenger seat of the other car.

"Clem told Sharon to duck, and gunfire began. When the shooting died down, Sharon put the car in reverse and backed up. She sat up and made a U-turn, almost hitting a truck. Sharon saw two cars turn around to follow her as she drove eastbound. She could see arms outside the car that had been close on her driver's side, and more shots were fired from that car. Sharon pulled into a gas station, and McCoy ran inside to get help. Clem was lying on the back seat bleeding. He was taken by ambulance to the hospital, where he was pronounced dead.

"Police recovered shell casings from the westbound lanes of Shawnee Mission Parkway near the ramp from I-35 and near the gas station Sharon had pulled into. A firearms examiner determined that they had been fired from at least five different firearms—three 9 mms, one .38 or .357 caliber, and one .40 caliber Smith & Wesson or 10mm. A metal bullet jacket was retrieved from Hollingsworth's body during the autopsy and given to police.

3

"A shoebox of ammunition was seized during the search of defendant's residence. Defendant's fingerprint was found on one of the boxes of ammunition in the shoebox. Four guns and a speed loader for a revolver also were seized from his residence. One of the guns, a .38 Special Taurus handgun, could have fired the bullet with the jacket retrieved from Hollingsworth's body during the autopsy." *Francis I*, 282 Kan. at 122-24.

After Francis was charged with Hollingsworth's murder, he was represented at the preliminary hearing by assistant public defender, Michael Bartee. In *Francis v. State*, No. 106,140, 2012 WL 4794595, at *3 (Kan. App. 2012) (unpublished opinion) (*Francis III*), our court's opinion affirming the denial of Francis' first K.S.A. 60-1507 motion, we described the factual circumstances of Robert Thomas' representation of Shannon during the preliminary hearing:

"At Francis' preliminary hearing on April 5, 2002, the district court appointed Thomas to represent Shannon as special counsel to determine whether Shannon could assert his Fifth Amendment right against self-incrimination. After an in-camera interview, the district court allowed Shannon to invoke his Fifth Amendment right. Thomas subsequently met with Francis on March 21, 2003. Three days later, Francis signed a waiver of any conflict of interest that could result from Thomas's prior representation of Shannon. On March 26, 2003, Thomas entered an appearance in Francis' case." *Francis III*, 2012 WL 4794595, at *3.

Before trial, the district court held a hearing to discuss Thomas' ability to represent Francis due to his previous representation of Shannon. At the hearing, the following colloquy occurred:

"MR. THOMAS: Judge, for the record, I mean, there should be in the court file a waiver that Mr. Francis has executed. It was filed and I provided a copy to the State. . . .
"Judge, I discussed this at length with Mr. Francis. I don't believe there is a conflict, and the reason being the thing that caused the conflict was a conversation between those two individuals. So I don' t know anything about—even let's say hypothetically the Government granted Corey Shannon complete immunity and put him

4

on the witness stand. Due to my 30 minutes of representation of Mr. Shannon, I don't know anything about him other than what John Francis knows or other than what Corey Shannon knows. I don't know anything I could use to cross-examine him, and that's the heart of—

"THE COURT: The point is, if he does testify, you would be ordered to represent the interest of Mr. Francis in his trial. You would be in a position of having to cross-examine Mr. Shannon who you formerly represented in this case.

"MR. THOMAS: That's correct, but I don't know anything about [Shannon] due to my representation that I would even have the opportunity to use against him which is the heart of conflict of interest, not to be disloyal to a previous client. And the fact is, he is at best an uncooperative witness for the Government. I don't see how I would be acting against his interests in any event.

. . . .

"THE COURT: Mr. Francis, I see that you have signed a letter or a document indicating that you are waiving that conflict of interest that is being discussed here in court. Have you had full opportunity to discuss this situation with Mr. Thomas?

"THE DEFENDANT: Yes.

"THE COURT: You understand the potential conflict that presents itself here if Mr. Shannon were to be involved in this case further?

"THE DEFENDANT: Yes.

"THE COURT: Is it still your decision that you're going to waive any conflict of interest that might exist by Mr. Shannon's later involvement in this case?

"THE DEFENDANT: Yes, sir."

The district court appointed John Jenab as a special counsel to advise Francis regarding the conflict of interest issue "and make sure this is something that is really in your best interest to do."

After a jury trial in which Francis was found guilty of first-degree murder, he was sentenced to life in prison with no parole eligibility for 40 years. In 2006, the Kansas Supreme Court affirmed the conviction and sentence on direct appeal. *Francis I*, 282 Kan. at 122.

Francis filed his first K.S.A. 60-1507 motion in 2007. He alleged numerous instances of ineffective assistance of trial and appellate counsel. The district court summarily denied the motion, but on appeal, our court remanded the matter to the district court to conduct an evidentiary hearing on the claims. *Francis v. State*, No. 99,596, 2009 WL 1312561 (Kan. App. 2009) (unpublished opinion) (*Francis II*).

On remand, prior to the evidentiary hearing, Francis filed a motion to amend his K.S.A. 60-1507 motion to add two more claims. One of these claims is relevant to this appeal. Francis asserted that Thomas "had a conflict of interest that was not waived by Francis." Specifically, Francis argued that multiple audio tapes existed which showed that Shannon was working with law enforcement officers "to direct the investigation towards Francis." Francis alleged that "Thomas' loyalty to Shannon created a conflict of interest that adversely affected Thomas' representation because it prevented him from objecting to the admitted hearsay statements in the February 21, 1998, video or attacking Shannon's credibility." *Francis III*, 2012 WL 4794595, at *3. Francis claimed "[t]here was no way, however, for Francis to understand the conflict or know the full extent of conflict until after the K.S.A. 60-1507 motion had been filed by Francis and present counsel had been appointed to represent Francis on his K.S.A. 60-1507 motion."

After the evidentiary hearing, the district court again denied the K.S.A. 60-1507 motion and our court affirmed the denial in *Francis III*, 2012 WL 4794595, at *1. In affirming the district court, we held that any conflict of interest did not affect Thomas' representation of Francis. 2012 WL 4794595, at *2. Our court recognized that Thomas did not appear to have an issue impeaching Shannon's credibility if necessary. 2012 WL 4794595, at *3. Additionally, even assuming a conflict of interest, we observed that a different attorney could not have elicited testimony from Shannon because he invoked his Fifth Amendment right not to testify at Francis' trial and was therefore unavailable to testify. 2012 WL 4794595, at *3. Finally, we noted that both Shannon and Francis signed conflict of interest waivers. 2012 WL 4794595, at *3.

On December 10, 2012, shortly after our court affirmed the denial of Francis' K.S.A. 60-1507 motion, Francis filed his second K.S.A. 60-1507 motion raising trial court error and ineffective assistance of counsel. The district court summarily denied this motion on April 25, 2013.

On May 6, 2013, Francis filed a pro se motion to amend his second K.S.A. 60-1507 motion to add two more claims of ineffective assistance of counsel. One of these claims is the subject of this appeal. In his motion to amend, Francis alleged that Thomas perpetrated a fraud on the court when he submitted a conflict of interest waiver that Shannon did not personally sign. In support of this claim, Francis submitted an affidavit purportedly from Shannon. The affidavit, dated December 19, 2012, states:

> "At no time did attorney Bob L. Thomas ever show me a Waiver of Conflict document, [or] for that matter have me to sign my name to such a document. Any [signature bearing] my name on a Waiver of Conflict document was not signed by me."

In May 2013, before the district court ruled on the motion to amend, Francis filed a notice of appeal of the district court's summary denial of his second K.S.A. 60-1507 motion. The district court ruled that because Francis had filed a notice of appeal it lacked jurisdiction to consider the motion to amend.

On appeal, our court affirmed the summary dismissal of the issues raised in Francis' second K.S.A. 60-1507 motion. *Francis v. State*, No. 110,310, 2014 WL 5312932, at *1-2 (Kan. App. 2014) (unpublished opinion) (*Francis IV*). However, we also found the district court erred when it concluded that it did not have jurisdiction to consider Francis' motion to amend. Accordingly, the matter was remanded with directions "for the district court to consider the motion—including the claim of manifest injustice—on its merits." 2014 WL 5312932, at *1-2, 10.

On May 22, 2015, Francis filed a motion to allow the untimely amendment of the second K.S.A. 60-1507 motion in order to enforce our court's mandate. In his motion, Francis argued that despite its untimeliness, his amended fraudulent waiver claim should be considered to avoid manifest injustice. Francis stated that he first became aware of Shannon's fraudulent conflict of interest waiver at an evidentiary hearing in November 2010 or January 2011. But Francis claimed that he could not bring the claim until almost two years later—after December 19, 2012—when he said that he received Shannon's affidavit.

The district court held a hearing to determine whether manifest injustice would result if Francis was not permitted to bring his new fraudulent waiver claim. At the hearing, Francis testified that he first became aware of the fraudulent waiver at an evidentiary hearing in January 2012 when he observed Shannon's signature on the waiver. Francis did not believe Shannon's signature was authentic based on Shannon's writings to Francis. Although Francis filed his second K.S.A. 60-1507 motion on December 10, 2012, almost a year later, he testified he did not receive Shannon's supporting affidavit until sometime after December 19, 2012. When asked why he did not submit the fraudulent waiver claim until May 2013, Francis stated that it was only when he saw the waiver and obtained the affidavit that he knew for sure the waiver was fraudulent.

Francis testified that the falsified waiver adversely impacted his trial because Shannon told Thomas that Francis had nothing to do with the murder. Francis said, "I got a letter right here where they told him that I was not involved in this incident." Because Thomas previously represented Shannon, Francis claimed that Thomas could not call him as a witness to testify to Francis' innocence or to show that Shannon had not signed the waiver. Lastly, Francis testified that he was actually innocent because he did not shoot and kill Hollingsworth or ride in the car that was involved in the shooting.

8

In response, the State contended the motion to amend should be denied because it was untimely and successive. The State also argued that, assuming Shannon's waiver was false, Francis had not shown prejudice.

The district court issued its oral ruling on January 7, 2016, finding that the fraudulent waiver claim was untimely and successive and neither manifest injustice nor exceptional circumstances exempted the motion to amend from the requirements of being timely and not successive. The district court noted that the false waiver claim was filed more than three years after Francis was on notice of the issue and that the Court of Appeals had held that if there was, in fact, a conflict of interest there was no showing that, under the circumstances, Thomas' representation of Francis was adversely affected.

Two months later, on March 9, 2016, Francis filed three pro se motions in district court. Two of the motions are the subject of this appeal: (1) a motion for relief from judgment, and (2) a motion to correct illegal sentence.

In his motion for relief, Francis argued he was entitled to add a new issue to his second K.S.A. 60-1507 motion based on newly discovered evidence. In this issue, Francis claimed he was actually innocent based on Shannon executing another affidavit on July 20, 2015, that stated:

> "That I knew John had nothing to do with killing Clem Hollingsworth, that Sharon Hollingsworth told me in an effort to compel my support, that she didn't really see who fired the shots that killed Clem Hollingsworth.
> "At the preliminary hearing of John F. Francis, I informed my then counsel Bob L. Thomas that John Francis had absolutely no involvement in the death of Clem Hollingsworth.
> "Also, that after the brief representation of me I had absolutely no contact (written, verbal or otherwise) with attorney Bob L. Thomas."

9

Attached to the pleadings was a handwritten letter Francis claimed was sent to him by Shannon stating that Francis did not murder Hollingsworth and that Shannon knows the identity of the murderer. The letter was not dated and the name of the individual who killed Hollingsworth was not mentioned. The letter was signed but the signature is illegible.

The State responded that this new claim was untimely, successive, and did not meet the exceptions that would allow consideration of the claim.

On March 21, 2016, the district court held a hearing on Francis' pro se motions. First, the district judge denied the motion for relief, stating:

> "I have read through all of the necessary documents in this case along with the transcript and for someone to claim newly discovered evidence, it really has to be something that was somehow buried or lost or something that was of such an undiscoverable quality that now it would be something that the Court would have to set aside everything that has happened and rehear the case, and the Court doesn't find that this affidavit by Corey Shannon is sufficient to qualify as that quality of newly, if it is newly discovered evidence, and so the court is going to deny the motion."

For his second new claim, which is also on appeal, Francis argued that his sentence was illegal under *Alleyne v. United States*, 570 U.S. 99, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013), because the district court did not submit the sentence-enhancing facts to a jury in order to lawfully increase his mandatory minimum sentence to a hard 40 sentence.

The district court disagreed, ruling that Kansas caselaw holds that the *Alleyne* holding may not be applied retroactively to those cases decided before the opinion was filed or for cases on collateral review. The district court found that Francis was tried, sentenced, and he appealed his case before the *Alleyne* decision was filed. Additionally,

10

the district court stated, "[Y]our case is on collateral review right now so *Alleyne* doesn't apply to yours going forward, at least that's the rule." The motion was denied.

Francis appeals.

STANDARDS OF REVIEW AND BRIEF SUMMARY OF RELEVANT KANSAS LAW

On appeal, Francis contends the district court erred when it denied the fraudulent conflict waiver claim, which Francis filed in his motion to amend, and his motion for relief to add a claim of newly discovered evidence of actual innocence in order to allow consideration of his conflict of interest claim. According to Francis, these two motions filed after the district court denied his second K.S.A. 60-1507 motion, satisfied the manifest injustice standard of K.S.A. 60-1507(f)(2) and constituted exceptional circumstances under K.S.A. 60-1507(c) and Supreme Court Rule 183(d) (2019 Kan. St. Ct. R. 228).

Generally, courts have three options when a movant files a K.S.A. 60-1507 motion:

> "'(1) The court may determine that the motion, files, and case records conclusively show the prisoner is entitled to no relief and deny the motion summarily; (2) the court may determine from the motion, files, and records that a potentially substantial issue exists, in which case a preliminary hearing may be held. If the court then determines there is no substantial issue, the court may deny the motion; or (3) the court may determine from the motion, files, records, or preliminary hearing that a substantial issue is presented requiring a full hearing.'" *Sola-Morales v. State*, 300 Kan. 875, 881, 335 P.3d 1162 (2014) (quoting *Fischer v. State*, 296 Kan. 808, 822-23, 295 P.3d 560 [2013]).

See K.S.A. 2016 Supp. 60-1507(b).

11

In the case of Francis' motion to amend, the district court conducted a preliminary hearing which involved testimony from Francis, a review of documents, and arguments of counsel. Under these circumstances, the appellate court must give deference to any factual findings made by the district court and apply a findings of fact and conclusions of law standard of review to determine whether the findings are supported by substantial competent evidence and whether those findings are sufficient to support its conclusions of law. *Bellamy v. State*, 285 Kan. 346, 354, 172 P.3d 10 (2007). The appellate court, however, has unlimited review over the district court's conclusions of law and its decision to grant or deny the K.S.A. 60-1507 motion. *White v. State*, 308 Kan. 491, 504, 421 P.3d 718 (2018). Even though the district court's legal conclusions are subject to an unlimited review, appellate courts do not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *Bellamy*, 285 Kan. at 353.

Francis also appeals the district court's denial of his motion for relief based on newly discovered evidence set forth in Shannon's affidavit dated July 20, 2015. Francis filed this motion to prove his actual innocence in order to permit consideration of his untimely and successive conflict of interest claim raised in his motion to amend.

Appellate courts review the denial of a motion for relief from judgment filed pursuant to K.S.A. 60-260(b) under an abuse of discretion standard. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 937, 296 P.3d 1106 (2013). However, as discussed later, Francis' motion is more appropriately characterized as a claim to establish actual innocence under K.S.A. 2016 Supp. 60-1507(f)(2)(A) in order to establish a gateway for the district court to consider Francis' untimely and successive motion to amend. As a result, we conduct a de novo review to determine whether the motion, files, and records of the case conclusively establish that the movant is not entitled to relief. *Beauclair v. State*, 308 Kan. 284, 301, 419 P.3d 1180 (2018).

Kansas law sets forth procedural requirements that movants must comply with before a district court may consider the merits of the motion. First, before the district court may consider the merits of a K.S.A. 60-1507 claim, a movant must file a timely motion. Under K.S.A. 2016 Supp. 60-1507(f), a prisoner demanding relief must file the motion within one year of either:

"(A) The final order of the last appellate court in this state to exercise jurisdiction on a direct appeal or the termination of such appellate jurisdiction; or

"(B) the denial of a petition for writ of certiorari to the United States supreme court or issuance of such court's final order following granting such petition."

If, based on the district court's own inspection of the motions, files, and records of the case, it determines the time limitations have been exceeded, the district court must dismiss the motion as untimely. K.S.A. 2016 Supp. 60-1507(f)(3). However, a district court may address the merits of the motion if the movant can show manifest injustice. K.S.A. 2016 Supp. 60-1507(f)(2). K.S.A. 2016 Supp. 60-1507(c) bars successive motions raising claims that were raised or could have been raised in a prior motion. But exceptional circumstances can justify consideration of a successive 60-1507 motion.

Francis readily admits that his motion to amend was untimely and successive. The crux of his argument—and this appeal—is that the district court erred because its failure to consider the untimely fraudulent waiver claim resulted in a manifest injustice and the successive claim was the result of exceptional circumstances. We will first consider whether the district court erred in finding that Francis failed to show manifest injustice to file his motion to amend out of time.

UNTIMELY K.S.A. 60-1507 MOTION

The crux of Francis' motion to amend focuses on his claim that the conflict of interest waiver filed in the district court on September 26, 2003, prior to Francis' trial,

13

was not signed by Shannon. In his affidavit, dated nine years later on December 14, 2012, Shannon attested that he had never seen or signed the conflict of interest waiver. But Francis' motion to amend was untimely filed under K.S.A. 60-1507(f)(1). Nevertheless, we will consider Francis' claim that the district court's denial of the motion was error because an extension of time was necessary to prevent manifest injustice under K.S.A. 60-1507(f)(2).

"'Manifest injustice' has been described" as meaning "'obviously unfair' or 'shocking to the conscience.'" *State v. Kelly*, 291 Kan. 868, 873, 248 P.3d 1282 (2011). On appeal, Francis contends that he filed his motion for relief in 2016 before a more restrictive manifest injustice standard was established in the 2016 amendment to K.S.A. 60-1507(f)(2)(A). As a result, Francis argues that our court should evaluate his claims for relief under the prior manifest injustice standard set forth in *Vontress v. State*, 299 Kan. 607, 325 P.3d 1114 (2014).

We agree. In *White*, 308 Kan. at 503, our Supreme Court held that the 2016 amendment implementing the more restrictive manifest injustice standard does not apply retroactively to motions filed before July 1, 2016. Motions filed before July 1, 2016, should be analyzed under the *Vontress* factors. 308 Kan. at 503. Given that Francis filed his second K.S.A. 60-1507 motion in 2012 and filed his amended motion before July 1, 2016, we will apply *Vontress* in analyzing Francis' claim of manifest injustice.

*Vontress* provides a nonexhaustive list of factors which includes:

> "whether (1) the movant provides persuasive reasons or circumstances that prevented him or her from filing the 60-1507 motion within the 1-year time limitation; (2) the merits of the movant's claim raise substantial issues of law or fact deserving of the district court's consideration; and (3) the movant sets forth a colorable claim of actual innocence, *i.e.*, factual, not legal, innocence." 299 Kan. at 616.

14

Under *Vontress*, "courts consider all factors under the totality of the circumstances rather than balancing factors against each other, need not give the factors equal weight, and should not consider any single factor dispositive." *White*, 308 Kan. at 504. We will apply the three *Vontress* factors to Francis' claim that Shannon did not sign the conflict of interest waiver filed by Thomas.

*Persuasive Reasons or Circumstances that Prevented Francis from Filing the Fraudulent Conflict of Interest Waiver Claim Within the One-Year Time Limitation*

In ruling on this issue, the district court found that Francis had filed the fraudulent conflict waiver claim "over three years after [Francis] was on notice of the issue." The district court found that no manifest injustice was shown to excuse this delay.

On appeal, Francis deflects whether there were persuasive reasons or circumstances that prevented him from filing this claim in a timely manner. He argues that under *Vontress* "the fact that the Petitioner filed the claim three years after being put on notice is irrelevant . . . because the Petitioner pleaded a colorable claim of factual innocence." We will address the colorable claim of factual innocence later in the opinion. We take at face value, however, our Supreme Court's admonition that all *Vontress* factors should be considered in the manifest injustice analysis. *White*, 308 Kan. at 504.

The record shows that the issue of Thomas' possible conflict of interest in representing Shannon prior to representing Francis was well known as early as 2002. During that year, Francis was aware that Thomas briefly represented Shannon to advise him of his Fifth Amendment right not to testify as a State's witness at Francis' preliminary hearing. Subsequently, on March 24, 2003, Francis signed a conflict of interest waiver regarding Thomas' prior representation of Shannon, and on March 26, 2003, Thomas entered his appearance in Francis' murder case.

15

In 2003, at the request of the State, a pretrial hearing was held regarding whether Thomas had a conflict of interest given his prior representation of Shannon. Francis was questioned by the district court about his knowing and voluntary signing of his conflict waiver. At that hearing, Thomas advised the district court that he would attempt to have Shannon also sign a conflict waiver prior to trial. Shannon's signed waiver was filed in court on September 26, 2003. Moreover, Francis' claim of a conflict of interest in Thomas representing Shannon was raised in Francis' first K.S.A. 60-1507 motion filed in 2007. In that motion, Francis claimed that Thomas' loyalty to Shannon adversely affected his representation of Francis. In short, the conflict issue involving Shannon has been at the forefront of this litigation for years.

Francis' assertions regarding when he first realized that Shannon's conflict waiver was fraudulent are inconsistent. In his May 22, 2015 motion to amend, Francis stated that he first discovered the fraudulent waiver at an evidentiary hearing in November 2010 or January 2011 when he observed Shannon's conflict waiver and knew it was a forgery. Francis testified he knew the waiver was a forgery because over the years since Francis' incarceration, he and Shannon wrote letters to one another and he was familiar with Shannon's handwriting. The record does support that both before and after Francis' trial the two men were acquaintances and corresponded with each other. As a result, it is apparent that Francis had the ability to ask Shannon for an affidavit as soon as he discovered the fraud in November 2010 or January 2011.

In contrast to his assertion that he knew of the fraudulent waiver in November 2010 or January 2011, however, Francis later testified that he did not know about the fraudulent waiver until a year later—in late January 2012. Regardless of these inconsistencies, if either factual scenario was true, Francis could have included the fraudulent waiver claim in his second K.S.A. 60-1507 motion filed on December 10, 2012. Instead, Francis did not file the fraudulent waiver claim as part of his motion to amend until May 6, 2013.

16

Lastly, Shannon's affidavit supporting Francis' belief that the conflict waiver is a forgery is dated December 14, 2012—only four days after Francis filed his second K.S.A. 60-1507 motion. Although Francis has not disclosed the date when he received Shannon's affidavit (other than sometime after December 19, 2012), Francis delayed filing the motion to add this claim until May 6, 2013—which was only 11 days after the district court denied his second K.S.A. 60-1507 motion.

On this record, Francis has not shown persuasive reasons or circumstances for the untimely filing of the fraudulent waiver claim as part of the motion to amend.

*Whether the Merits of Movant's Claim Present Substantial Issues of Law or Fact*

Francis contends that his legal representation was adversely affected by Thomas' conflict of interest with Shannon. Francis asserts that Thomas fraudulently filed the conflict waiver which was not, in fact, signed by Shannon. He also claims that Shannon possessed exonerating evidence about Francis prior to trial which he imparted to Thomas. Francis argues that because this evidence could potentially implicate Shannon, Thomas' duty to protect Shannon's interest prevented him from putting Shannon on the stand at Francis' trial, to testify about the exonerating evidence.

The State counters that assuming Shannon's conflict waiver was a forgery, Francis has not shown how this fact adversely affected Thomas from diligently representing Francis. The State contends that Shannon's fraudulent signature would only have potentially affected Shannon's representation, not Francis' representation, which is a claim that only Shannon could bring. Moreover, Francis waived the conflict almost one year before Shannon purportedly signed the conflict waiver which shows that Francis' decision to waive any conflict was not dependent on Shannon's decision to waive the conflict. Finally, the State emphasizes that Thomas vigorously represented Francis by

17

presenting a succinct theory of defense, cross-examining the State's witnesses on their inconsistent testimony, calling defense witnesses, and arguing for acquittal at trial.

In denying this claim, the district judge referred to our court's opinion affirming the denial of Francis' first K.S.A. 60-1507 motion on the same general topic of whether Thomas had a conflict of interest:

> "I believe that the Court of Appeals has ruled that even if there was a [conflict], that complaint in that case might have been more by the witness [Shannon] as opposed to the defendant and that there has been no showing that a conflict affected Attorney Thomas' representation of the defendant at trial."

Generally, a defendant's counsel owes the client a duty of loyalty and a duty to avoid conflicts of interest. *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). There are three categories of ineffective assistance of counsel claims. Relevant to Francis' claim is the third category, "where the defendant's attorney 'actively represented conflicting interests.'" *State v. Galaviz*, 296 Kan. 168, 181, 291 P.3d 62 (2012) (quoting *Mickens v. Taylor*, 535 U.S. 162, 166, 122 S. Ct. 1237, 152 L. Ed. 2d 291 [2002]).

In order to prevail under this category, a defendant must first establish that his attorney actively represented conflicting interests. *Fuller v. State*, 303 Kan. 478, 487, 363 P.3d 373 (2015). As described by the Kansas Supreme Court, "[t]he United States Supreme Court has recognized three subcategories of conflict of interest claims: (1) the automatic reversal exception, (2) the adverse effect exception, and (3) what we have labeled the '*Mickens* reservation.'" *Fuller*, 303 Kan. at 487. The first subcategory involves cases of "'multiple concurrent representations' which is when defense counsel 'is simultaneously representing codefendants with antagonistic interests in the same

proceeding.'" 303 Kan. at 487 (quoting *State v. Stovall*, 298 Kan. 362, 376, 312 P.3d 1271 [2013]). This subcategory does not apply here.

Francis argues that his claim falls under the second or third subcategories. The second subcategory, employing the adverse exception test, also applies when there is concurrent representation of codefendants. This subcategory requires a defendant to show that the conflict of interest affected the adequacy of the attorney's representation and "'applies when there is (1) an active conflict of interest because of concurrent representation of codefendants but (2) there was no objection to the conflict of interest before or during the proceeding.'" *Stovall*, 298 Kan. at 376 (quoting *Galaviz*, 296 Kan. at 183). Under the adverse exception, prejudice will only be presumed where the conflict has significantly affected counsel's performance thereby rendering the verdict unreliable. *Galaviz*, 296 Kan. at 184.

Francis argues that his claim falls under this second category because, although no one objected, Thomas concurrently represented both Shannon and Francis during this litigation.

The record shows that Thomas began and ended his brief representation of Shannon on April 5, 2002, during Francis' preliminary hearing. Of note, in Shannon's affidavit regarding his conflict waiver, Shannon stated, "after the brief representation of me I had absolutely no contact (written, verbal or otherwise) with attorney Bob L. Thomas." Thomas did not begin representing Francis until March 26, 2003. Thus, Shannon was not a concurrent client but a former client. Additionally, the second subcategory does not apply because it requires concurrent representation among codefendants. Shannon was a potential witness in the case but he was never a codefendant. See *State v. McDaniel*, 306 Kan. 595, 610, 395 P.3d 429 (2017).

19

Next, we consider the third subcategory, the *Mickens* reservation, which arises in situations where a conflict is "'rooted in counsel's obligations to *former* clients' or 'counsel's personal or financial interests.'" *Galaviz*, 296 Kan. at 184 (quoting *Mickens*, 535 U.S. at 174). Under this category, the test for relief has yet to be determined, but there are two possible approaches. *State v. Moyer*, 309 Kan. 268, 279, 434 P.3d 829 (2019). According to the Kansas Supreme Court, "'[w]e have referred to this subcategory as the *Mickens* reservation because the Supreme Court did not articulate what additional burden, *e.g.*, prejudice or adverse effect, a defendant must satisfy before receiving relief based on such conflicts of interest.'" *Moyer*, 309 Kan. at 279. Instead, past courts have evaluated a former client conflict of interest case under either the standard articulated in *Strickland* or the standard in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). *McDaniels*, 306 Kan. at 610.

*Strickland* provides that "relief would not be granted unless the defendant could demonstrate both that the attorney's performance was deficient and a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *McDaniel*, 306 Kan. at 610. The *Culyer* standard is the adverse effect exception where "the defendant must demonstrate counsel labored under an active conflict of interest that affected the adequacy of the representation." *McDaniel*, 306 Kan. at 610. This test is a lesser standard than *Strickland* because *Strickland* imposes a burden on the defendant to show actual prejudice by the attorney's performance. *Moyer*, 309 Kan. at 279.

Francis urges this court to use the more lenient adverse effect standard because the State concedes this is the appropriate test. However, Francis has not shown that any conflict of interest entitles him to relief under either standard. First, while Francis has claimed a conflict of interest, he has not shown how this conflict applies to him rather than Shannon. Second, he fails to show how any conflict adversely affected Thomas'

representation or whether the result or outcome of the murder trial would have been different.

Francis testified that he was aware Thomas previously represented Shannon when he decided to retain Thomas to represent him at trial. Francis also informed the district court in 2003 that he understood the potential consequences of the conflict, even those that could arise due to Shannon's later involvement in the case, and he still wanted to retain Thomas as his attorney. Francis signed his conflict of interest waiver and orally advised the district court that he desired to waive any conflict with Thomas' prior representation of Shannon.

Under *Strickland*, Francis argues that the outcome of the trial would have been different had Shannon been allowed to testify at trial. Francis argues that because of the conflict of interest, Thomas could not put Shannon on the stand to reveal his exonerating evidence. The record shows, however, that it was not the effect of any conflict that prevented Shannon from testifying or revealing exonerating evidence. Rather, Shannon invoked his Fifth Amendment right not to testify in the criminal proceedings. Thus, assuming there was a conflict of interest, Shannon still would not have testified at Francis' trial based on his constitutional rights, and the outcome at Francis' trial would have been the same.

*Strickland* also requires that Francis demonstrate how Thomas was deficient in representing him. Francis only makes conclusory statements in this regard. However, Thomas informed the district court before trial that he did not learn any facts regarding Shannon's or Francis' involvement in the crime during his 30-minute conversation with Shannon. Thomas also testified that he would have no reservation in cross-examining Shannon if Shannon did testify at trial.

21

As our court determined in Francis' first K.S.A. 60-1507 proceeding:

"[T]he transcripts reveal that Thomas did not appear to have reservations impeaching Shannon if necessary, as evidenced during the cross-examination of Sergeant Mike Daniels where Thomas elicited testimony that Shannon was one of three suspects in an unrelated 1995 murder. As the district court noted, even had Francis been represented by another counsel, that counsel would not have been able to elicit testimony from Shannon to attack Shannon's credibility because Shannon clearly asserted his Fifth Amendment right." *Francis III*, 2012 WL 4794595, at *3.

In denying Francis' fraudulent conflict waiver claim, the district court reprised our court's rationale and conclusion in affirming the denial of Francis' first K.S.A. 60-1507 motion. As determined by our court:

"Simply put, Francis claims that Thomas' conflict of interest due to his prior representation of Shannon, a witness under subpoena by the State to testify at the preliminary hearing, rendered his assistance ineffective. We are not persuaded that Thomas' conflict affected his representation of Francis, and Francis is bound by his waiver of this claim when he hired Thomas to represent him." *Francis III*, 2012 WL 4794595, at *2.

In summary, the second factor of the *Vontress* test asks whether the merits of the movant's claim raise substantial issues of law or fact which deserve the district court's consideration. Francis has failed to show how any defect in Shannon's conflict waiver applies to him, as opposed to Shannon. Moreover, Francis has also failed to show that any defect in Shannon's conflict waiver adversely affected Thomas' representation of Francis or prejudiced him in any way. The second factor of the *Vontress* test does not favor a finding of manifest injustice.

22

*A Colorable Claim of Actual Innocence*

As noted earlier, Francis contends that his pro se motion for relief, which asserted newly discovered evidence of his actual innocence, provides the gateway for the claim in his motion to amend that Thomas had a conflict of interest due to Shannon's fraudulent conflict waiver. Francis' claim of newly discovered evidence was filed on March 9, 2016, two months after the district court denied the fraudulent waiver claim in Francis' motion to amend. On appeal, citing *Beauclair*, Francis asserts, "his claim of actual innocence provides a gateway through which he can raise the conflict of interest claim." In essence, Francis argues that the newly discovered evidence of his actual innocence trumps any untimeliness or suggestions that Shannon's fraudulent conflict waiver did not present a substantial issue of law or fact.

Relevant to this appeal, Francis invoked K.S.A. 60-260(b)(2) and K.S.A. 60-259(a) in seeking to present a new claim of actual innocence. The new claim, characterized as newly discovered evidence, alleged that Shannon's July 20, 2015 affidavit "exonerate[d Francis] by proving that the State[']s only incriminating evidence, the testimony of Sharon Hollingsworth, was perjured." In particular, Shannon's affidavit attested that Francis is innocent and "that Sharon Hollingsworth told me in an effort to compel my support, that she didn't really see who fired the shots that killed Clem Hollingsworth." A handwritten letter that Francis claimed came from Shannon also stated that Francis did not murder Hollingsworth but the letter writer knew who actually committed the murder, although this individual was not identified. In his motion, Francis asserted: "The granting of this motion will save movant as well as the [court's] time and resources by eliminating the need for an additional [K.S.A.] 60-1507 motion."

The district court summarily denied the motion, finding

> "for someone to claim newly discovered evidence, it really has to be something that was somehow buried or lost or something that was of such an undiscoverable quality that now it would be something that the Court would have to set aside everything that has happened and rehear the case, and the Court doesn't find that this affidavit by Cory Shannon is sufficient to qualify as . . . newly discovered evidence, and so the Court is going to deny the motion."

On appeal, Francis does not cite or brief K.S.A. 60-260(b)(2) and K.S.A. 60-259(a) or the relevant law applicable to motions for relief from judgment based on "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial . . . ." K.S.A. 2016 Supp. 60-260(b)(2). Similarly, the State does not contest the vehicle by which Francis presents his claim of actual innocence. Accordingly, we will consider this claim, under K.S.A. 60-1507, as Francis has presented it—newly discovered evidence proving his actual innocence which provides a gateway through which Francis can raise his conflict of interest claim. See *Beauclair*, 308 Kan at 289.

A brief summary of our standards of review is in order. The Kansas Supreme Court has adopted the actual innocence standard as outlined in *Murray v. Carrier*, 477 U.S. 478, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986). *Beauclair*, 308 Kan. at 301. In order to meet this standard, a movant must show that it is more likely than not that no reasonable juror would have convicted the defendant in light of the new evidence. 308 Kan. at 303; K.S.A. 2016 Supp. 60-1507(f)(2)(A).

In considering whether the district court should have conducted an evidentiary hearing before denying a new trial in the context of a K.S.A. 60-1507 motion, an appellate court considers:

"(1) whether the motion alleges facts which do not appear in the original record which, if true, would entitle the movant to relief; (2) whether the motion adequately identifies readily available witnesses whose testimony would support these new facts and demonstrate that the movant should receive a new trial; and (3) whether [the movant's] newly discovered evidence could have been produced at trial through the exercise of reasonable diligence." *Moncla v. State*, 285 Kan. 826, Syl. ¶ 5, 176 P.3d 954 (2006).

The focus of our analysis is on the first and third factors of the *Moncla* test. Do the facts alleged in the motion to amend appear in the original record? Could this purported newly discovered evidence have been produced at trial through the exercise of reasonable diligence?

As the district court found in denying Francis' actual innocence claim, there was no showing that Sharon Hollingworth's uncertainty about the identity of her son's killer was newly discovered evidence. In fact, *prior to trial*, Sharon's uncertainty regarding her eyewitness identification was well known to Francis, Shannon, and Thomas.

Prior to trial, Francis moved to suppress a search warrant in part because Francis contended that the affidavit in support of the warrant falsely stated that Sharon positively identified him as the murderer. On direct appeal, our Supreme Court acknowledged that the trial court observed "there is a question about the certainty of [Sharon's] identification," but it concluded that the affidavit was truthful when it stated that Sharon "'has wavered from being certain about having seen Francis in one of the suspect vehicles.'" *Francis I*, 282 Kan. at 130.

On direct appeal, Francis also objected to the district court providing the jury with two instructions on aiding and abetting. In disputing Francis' claim that these two instructions were not supported by the trial evidence, our Supreme Court found:

"The evidence in this case, however, presents a classic situation in which aiding and abetting instructions are appropriate. A car with several occupants pulled up beside the driver's side of the car in which Hollingsworth was riding. Francis was in the front passenger seat of the car that pulled alongside, several arms were outside its window, and at least five different weapons were fired at the car in which Hollingsworth was riding. [Francis] was in a position to shoot at the car Hollingsworth was riding in, and from this evidence it reasonably may be inferred that several persons shot at it.

" . . . The fatal shots were not identified, and, therefore, *Sharon Hollingsworth did not identify Francis as the shooter of the fatal shots.*" (Emphasis added.) *Francis I*, 282 Kan. at 144-45.

Moreover, evidence of Sharon's uncertain identification was thoroughly developed by Thomas at trial. During trial, a video was admitted in evidence of a one-sided conversation between Sharon, Clem Hollingsworth III, and Shannon. In the video, Sharon asked Shannon who killed her son and if it was the person Sharon thought it was. As the district court analyzed this trial evidence in denying Francis' first K.S.A. 60-1507 motion:

"Part of Mr. Thomas' defense strategy in representing [Francis] was to attack the credibility of Sharon Hollingsworth, the only eyewitness who identified [Francis] as the person who killed her son. [Francis] has presented no evidence that admission of the video at issue adversely affected Mr. Thomas' representation of [Francis] in any way. In fact, the video reflects that after her son was murdered, Sharon Hollingsworth asked an individual (unknown to the jury to be Shannon) who killed her son. After this videotaped conversation with Shannon, Sharon changed her story from being uncertain about who killed her son to being certain that [Francis] killed him.

"Admission of the video, with the statements of Shannon redacted, could have presented a reason for Sharon Hollingsworth to change her story separate from what she actually witnessed the night of her son's murder. *This suggests that Sharon did not actually see who shot her son.* It is conceivable that allowing admission of this video was part of Mr. Thomas' defense strategy in impeaching the credibility of Sharon's eyewitness account. Witness credibility is an issue for the jury to decide, and they found Sharon Hollingsworth's testimony to be credible despite this impeachment." (Emphasis added.)

26

In denying Francis' first K.S.A. 60-1507 motion, our court validated the district court's understanding of the evidence regarding Sharon's eyewitness testimony:

> "[T]he record shows Thomas sufficiently impeached the credibility of Sharon Hollingsworth's eyewitness testimony by calling into question inconsistencies in her statements regarding the level of certainty of her identification of Francis as the passenger in the suspect vehicle and whether she actually witnessed firearms being used outside the suspect's car window." *Francis III*, 2012 WL 4794595, at *8.

Moreover, our court in affirming the district court's denial of Francis' second K.S.A. 60-1507 motion also determined that "[Sharon] *could not say definitively* who fired which shots." (Emphasis added.) *Francis IV*, 2014 WL 5312932, at *3.

In summary, the record clearly shows that Shannon's claim in his affidavit that Sharon "didn't really see who fired the shots that killed Clem Hollingsworth" was not newly discovered evidence but evidence that had been well known prior to trial—13 years prior to Francis filing his motion to amend. The evidence is not new, and Sharon's inconsistent eyewitness identifications were known prior to trial and presented at trial to impeach her eyewitness testimony. Francis has failed to meet the first and third requirements set forth in *Moncla* to establish newly discovered evidence of actual innocence.

Additionally, in Shannon's July 20, 2015 affidavit, he also asserted that he advised Thomas at the preliminary hearing that Francis was not involved in Hollingsworth's death. That is also the gist of the handwritten letter that Francis claimed he received from Shannon. But given Shannon's invocation of his Fifth Amendment right against self-incrimination, this evidence, which allegedly was known to Shannon prior to trial, could not have been presented at trial due to his unavailability as a witness.

Although Francis suggests the possibility that Shannon may be available to testify at the present time, Kansas courts have addressed similar situations wherein a codefendant invoked the Fifth Amendment at trial but later stated a willingness to testify at a new trial. As our Supreme Court has held, "[t]estimony of a witness who initially refused to testify under the Fifth Amendment is not a basis for a new trial as newly discovered evidence." *State v. Redford*, 248 Kan. 130, Syl. ¶ 4, 804 P.2d 983 (1991). In this regard as well, Francis has failed to establish the necessary requirements for newly discovered evidence of actual innocence.

Lastly, assuming Francis had shown newly discovered evidence, our review persuades us the evidence did not meet the actual innocence standard adopted in *Beauclair*. In short, Francis has not shown that it is more likely than not that no reasonable juror would have convicted the defendant in light of the new evidence. See 308 Kan. at 303. Apart from the evidence mentioned in Shannon's July 20, 2015 affidavit and the handwritten letter, the State presented the following trial evidence:

- In a phone call, at the time of Johnson's death, Francis told Shannon that if he did not get Hollingsworth, "'he would get the next thing closest to him.'" *Francis I*, 282 Kan. at 123. Sharon, who overheard the conversation, testified that Francis meant "'he was going to kill me.'" 282 Kan. at 140.

- Francis tried to persuade Gillihan to discount Hollingsworth's bond by telling him that he would not be obligated for the money very long, just until Hollingsworth's body was found. In Gillihan's presence, Francis referred to Hollingsworth as "'the motherfucker who killed my cousin a couple weeks ago.'" 282 Kan. at 123.

- Francis could have known when Hollingsworth was released from jail because Francis' aunt was notified of the release.

28

- About five hours after he was released from jail, Hollingsworth was recognized by a young man at Harrah's around midnight. Hollingsworth was ambushed and murdered about three hours later, shortly after 3 a.m.

- Sharon recognized Francis as one of the individuals in the vehicle which drove alongside her and her son at the time several weapons were fired at the car. Sharon made the identifications in a pretrial photographic lineup which was admitted at trial and in person when she testified at trial.

- Over 40 bullet holes were found in the car.

- During a search of Francis' residence, boxes of ammunition were found in a shoebox. Francis' fingerprint was found on one of the boxes of ammunition. Four guns were also found. According to a firearm's expert, one of the guns, a .38 Special Taurus handgun, could have fired the bullet with the metal jacket which was retrieved from Hollingsworth's body during the autopsy.

- Francis' house-arrest monitor was disabled at the time of Hollingsworth's murder.

Considering this evidence together, even if Francis had produced at trial the evidence contained in Shannon's July 20, 2015 affidavit, he would still have failed to show that it is more likely than not that no reasonable juror would have convicted Francis in light of the claimed new evidence of actual innocence. See *Beauclair*, 308 Kan. at 303; K.S.A. 2016 Supp. 60-1507(f)(2)(A).

Based on the motions, files, and records of the case, it is apparent that Francis' motion to amend was untimely as set forth in K.S.A. 2016 Supp. 60-1507(f)(3).

29

Moreover, considering the three factors of the *Vontress* standard, we are persuaded that under the totality of the circumstances the district court did not err in finding that Francis failed to show that the time period should be extended in order to prevent a manifest injustice. See K.S.A. 2016 Supp. 60-1507(f)(2).

SUCCESSIVE K.S.A. 60-1507 MOTION

There is a procedural requirement that should be met before a district court considers the merits of a successive K.S.A. 60-1507 motion. As summarized by our Supreme Court:

"Under K.S.A. 60-1507(c), a sentencing court is not required to entertain a second or successive motion for similar relief on behalf of the same prisoner. See also Supreme Court Rule 183(d) (2018 Kan. S. Ct. R. 223) (sentencing court may not consider successive motion by same movant when ground for relief determined against movant in prior motion; prior determination on merits; and justice not served by reaching merits of subsequent motion); *State v. Trotter*, 296 Kan. 898, 904, 295 P.3d 1039 (2013) (K.S.A. 60-1507 movant presumed to have listed all grounds for relief). To avoid having a second or successive K.S.A. 60-1507 motion dismissed as an abuse of remedy, the movant must establish exceptional circumstances. *State v. Mitchell*, 284 Kan. 374, Syl. ¶ 5, 162 P.3d 18 (2007). 'Exceptional circumstances are unusual events or intervening changes in the law that prevented the defendant [from] raising the issue in a preceding [K.S.A.] 60-1507 motion.' 284 Kan. 374, Syl. ¶ 5. The burden to make such a showing lies with the movant. *Wimbley v. State*, 292 Kan. 796, 805, 275 P.3d 35 (2011)." *Beauclair*, 308 Kan. at 304.

On appeal, Francis argues that his "showing of a colorable claim of factual innocence would allow consideration of this successive 1507 [motion] and would allow claims previously decided adversely to [Francis] to be re-litigated."

30

It is true that our Supreme Court in *Beauclair* found that a colorable claim of actual innocence based on newly discovered evidence may qualify as an "unusual event" that is an exceptional circumstance that excuses the procedural bar of successiveness under K.S.A. 60-1507(c). 308 Kan. 284, Syl. ¶ 2. However, as we have just discussed in the context of Francis' untimely motion, we are persuaded that he has failed to show a colorable claim of actual innocence. As a result, his successive claim is procedurally barred, and the district court did not err in denying Francis' motion to amend and motion for relief.

DENIAL OF MOTION TO CORRECT ILLEGAL SENTENCE

Francis contends the district court erred when it denied his pro se motion to correct an illegal sentence. According to Francis, the district court was required to retroactively apply *Alleyne* and submit the underlying facts of his hard 40 sentence to a jury.

Our Supreme Court has held that the rule of law enunciated in *Alleyne*

"holding that a criminal defendant's right to a jury trial under the Sixth Amendment to the United States Constitution requires that any fact which increases a sentence beyond the mandatory minimum must be submitted to a jury and proven beyond a reasonable doubt, cannot be applied retroactively to invalidate a sentence that was final when the *Alleyne* decision was released." *State v. Kirtdoll*, 306 Kan. 335, Syl. ¶ 1, 393 P.3d 1053 (2017).

Francis was convicted, sentenced, and his case was affirmed on direct appeal before the *Alleyne* decision was rendered in 2013. As a result, Francis' case was final by the time *Alleyne* was decided and, in keeping with *Kirtdoll*, that decision may not be retroactively applied to Francis' sentence at this later time.

Francis candidly concedes that our Supreme Court has already decided this issue adversely to him in *Kirtdoll*, but he disagrees with the holding and intends to petition our

31

Supreme Court for review. Our court is duty-bound to follow Kansas Supreme Court precedent unless there is some indication that the court is departing from its previous position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). We have no indication that our Supreme Court is departing from *Kirtdoll*.

Affirmed.